[No. 45571.   En Banc.   April 5, 1979.]

PORTAGE BAY–ROANOKE PARK COMMUNITY COUNCIL, ET AL,
*Respondents,* v. THE SHORELINES HEARINGS BOARD,
ET AL, *Respondents,* DAVID B.
HURLBUT, *Appellant.*

*Mary Ellen Hanley* (of *Karr, Tuttle, Koch, Campbell, Mawer & Morrow, P.S.*), for appellant.

*Slade Gorton, Attorney General,* and *Wayne L. Williams, Assistant,* for respondent Shorelines Hearings Board.

*Roger M. Leed,* for respondent Portage Bay–Roanoke Park Community Council, et al.

DOLLIVER, J.—This case was certified to us from the Court of Appeals after an appeal from the Superior Court's affirmation and modification of a permit issued by the Shorelines Hearings Board (Board).

On May 21, 1973, Dr. David Hurlbut applied to the City of Seattle for a substantial development permit to construct a floating walk and service facilities for 12 floating homes (houseboats) and dryland parking for 12 cars. The city, on July 7, 1975, issued a substantial development permit to Dr. Hurlbut for the proposed project with two conditions imposed: the number of houseboats was reduced from 12 to 6, and the total development could extend no more than 350 feet northeast and normal to the centerline of vacated Fuhrman Avenue.

The Portage Bay–Roanoke Park Community Council (Council) and residents of the area appealed the issuance of the permit to the Board. The Council contended the permit should not have been issued because the project interferes with the view of property owners and restricts the public right of navigation and thus violates the Shoreline Management Act of 1971 (SMA), RCW 90.58. The Council also claims the city improperly failed to consider its own then–proposed Shorelines Master Program. Dr. Hurlbut appealed, arguing the permit should have been issued without the two conditions attached.

After 7 days of hearings, the Board issued an order which modified the permit to allow construction of moorage and related improvements for 8 houseboats and ordered Dr. Hurlbut to execute an easement to ensure public access to the landscaped area of the project. Both the Council and Dr. Hurlbut appealed to the King County Superior Court.

The court essentially affirmed the Board's order with some minor changes in language. Additionally, it ordered the Board to reimburse Dr. Hurlbut for his costs in having the proceedings of the Board transcribed. Dr. Hurlbut and the Council appealed the court's decision and the Board appealed the order requiring it to reimburse Dr. Hurlbut for the costs of transcription.

We are confronted with four issues: (1) Is the permit invalid because it is contrary to provisions relating to the public benefit and aesthetic qualities contained in RCW

90.58.020? (2) Should the Board have .applied the provisions of draft No. 4 of the Seattle Shorelines Master Program to the present application? (3) Was the action of the Board limiting the project to 8 moorages and requiring Dr. Hurlbut to execute the easement arbitrary and capricious or clearly erroneous? and (4) Is the Board required to prepare and turn over to the reviewing court, at its own expense, a transcript of the testir¬ony?

I

■ The contention that the permit is invalid because of a lack of public benefit is based on RCW 90.58.020. The Council points to the second paragraph which states:

It is the policy of the state to provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses. This policy is designed to insure the development of these shorelines in a manner which, while allowing for limited reduction of rights of the public in the navigable waters, will promote and enhance the public interest. This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and corollary rights incidental thereto.

As both Dr. Hurlbut and the Council observe, any common–law public benefit doctrine this state may have had prior to 1971 (*see Wilbour v. Gallagher*, 77 Wn.2d 306, 462 P.2d 232, 40 A.L.R.3d 760 (1969)), has been superseded and the SMA is the present declaration of that doctrine. Referring to the language in RCW 90.58.020, we said in *Department of Ecology v. Ballard Elks Lodge No. 827*, 84 Wn.2d 551, 557, 527 P.2d 1121 (1974):

[I]t is within the contemplation of the legislation that there will, of necessity, be some future and additional development along shorelines in the state, including over–the–water construction, and it does not purport to totally prohibit such development. Rather, the enunciated policy stresses the need that such future development be carefully planned, managed, and coordinated in keeping with the public interest.

The Council argues there must be a compensating or off-setting public benefit before the permit can be granted. This is not what RCW 90.58.020 requires. While it requires a recognition of public rights of navigation, it does not mandate a calculation of equal public benefits to be offset against private benefits. Rather, it declares public policy is to "[plan] for and [foster] all reasonable and appropriate uses . . . [allow] for limited reduction of rights of the public in the navigable waters" and "[protect] generally public rights of navigation and corollary rights incidental thereto." Both the Board and the trial court concluded that, when the resultant intensification of water uses by the houseboat occupants, their guests and others attracted to the area by the project was compared to the loss of some of the existing residential uses, the project was not prohibited by the SMA and was consistent with public residential rights. We agree. The position of the Board is neither arbitrary and capricious nor clearly erroneous.

The second attack by the Council under RCW 90.58.020 concerns view impairment and aesthetic considerations. The Board and the trial court specifically found no merit in the claim "view intrusion" would be created by the house-boats and held that "absent a refined master program which might address such consideration, the Shoreline Management Act cannot be read to preclude floating homes on esthetic grounds." The court and Board also found "Testimony was inconclusive that additional houseboats in the neighborhood would have a negative effect on property values."

■ To support its position, the Council cites *Department of Ecology v. Pacesetter Constr. Co.*, 89 Wn.2d 203, 571 P.2d 196 (1977). This case is inapposite on the question of compensation for view impairment. *Pacesetter* specifically found property values would be reduced by the buildings; here no such finding was made. While it is true we stated in *Pacesetter* at page 211 that many cases have held

protection of aesthetic values alone would justify the exercise of police power without payment, there was here neither a "refined master program" which addressed such matters and set aesthetic standards nor a violation of a specific aesthetic standard such as height limitation. *See* RCW 90.58.320. The Board did not err in refusing to vacate the permit on the grounds of aesthetics and view impairment.

II

On the question of the failure of the Board to apply the provisions of draft 4 of the Seattle Shorelines Master Program to the permit application, finding of fact 11 of the Board, affirmed by the trial court, says:

On the date the application for the project was filed, May 21, 1973, Seattle had no draft master program. Draft Four of Seattle's Master Program which existed in published form when the permit for the project was issued on July 7, 1975 designated the subject site as an Urban Stable environment and deemed floating homes within such environment a conditional use. However, subsequent to the publication of Draft Four and *prior to* July 7, 1975, the Seattle City Council voted that floating homes in the Portage Bay area be a permitted, rather than a conditional use. Draft Five of the Seattle Master Program, published in November, 1975, continued to designate floating homes in the Portage Bay area as a permitted use. By the time this matter came to hearing in late December, 1975, the City Council had once again reversed its designations. The Portage Bay area was to be within the Urban Residential environment and floating homes in Portage Bay were to be a conditional use. The final master plan adopted by the City Council on March 29, 1976 designated floating homes in the Portage Bay area as a permitted use although subsequent correspondence from Councilman Miller informed the Board that this was a drafting error and the use is in fact conditional.

Counsel does not assign error to this finding and it becomes

the established fact of the case. *Lakeside Pump & Equip., Inc. v. Austin Constr. Co.,* 89 Wn.2d 839, 576 P.2d 392 (1978). Conclusion of law No. 3 by the Board, adopted by the trial court, provides:

Considering the uncertainty expressed by the City of Seattle with regard to the most desirable treatment of floating homes under its master program as documented in Finding of Fact XI, the Board concludes that, with regard to a use or environment designation for floating homes, *no ascertainable master program existed* for the City of Seattle at the time the permit was issued. Any attempt to either establish or limit property rights on the basis of decision making which has been demonstrably subject to such uncertainties would prompt serious constitutional concerns. Thus, the Board must rely in its review on the policies of the SMA enunciated in RCW 90.58.020.

(Italics ours.)

RCW 90.58.140(2) provides:

(2) No substantial development shall be undertaken on shorelines of the state without first obtaining a permit from the government entity having administrative jurisdiction under this chapter.

A permit shall be granted:

(a) From June 1, 1971 until such time as an applicable master program has become effective, only when the development proposed is consistent with: (i) The policy of RCW 90.58.020; and (ii) after their adoption, the guidelines and regulations of the department; and (iii) *so far as can be ascertained,* the master program being developed for the area;

(Italics ours.)

Could the master program be "ascertained"? The Board and the trial court concluded in view of the uncertainty experienced by the Seattle City Council spelled out in finding of fact No. 11, no ascertainable master program existed. Adequate facts exist for this conclusion and we will not disturb it.

### III

Dr. Hurlbut argues it was arbitrary and capricious or clearly erroneous for the Board to limit his permit application to 8 houseboats and to require him to execute an easement. Dr. Hurlbut's proposal has been subject to intense scrutiny by three independent bodies: the City of Seattle, the Shorelines Hearings Board, and the trial court. After reviewing the entire record before us, we are not left with the firm and definite conviction that a mistake has been made nor did the Board take willful and unreasoning action in disregard of the facts and circumstances. *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 578 P.2d 1309 (1978); *English Bay Enterprises, Ltd. v. Island County,* 89 Wn.2d 16, 568 P.2d 783 (1977). The decision of the Board is not clearly erroneous nor is it arbitrary and capricious. Rather, it is a carefully balanced determination of the respective rights and interests of the parties and the policies enunciated in the SMA.

### IV

The final question is whether the Board must pay for the transcript of its proceedings. RCW 90.58.180(3) provides for judicial review of Board proceedings as provided in RCW 34.04, the administrative procedures act. RCW 34.04.130(4) reads:

> Within thirty days after service of the petition, or within such further time as the court may allow, the *agency shall transmit to the reviewing court* the original or a certified copy of the entire record of the proceeding under review; but, by stipulation of all parties to the review proceeding, the record may be shortened. Any party unreasonably refusing to stipulate to limit the record may be taxed by the court for the additional costs. The court may require or permit subsequent corrections or additions to the record when deemed desirable.

(Italics ours.)

The administrative procedures act and the SMA are silent on who pays the costs of transcription. The Board points out it is a quasi–judicial body (RCW 90.58.170), and

asserts its position as analogous to that of a superior court, *i.e.*, while a superior court certifies its record to an appellate court, the costs for preparation of that record are borne by the party taking the appeal. We believe this analogy is apt and, in the absence of language in the administrative procedures act or the SMA authorizing payment of costs of transcription by the Board, we hold this is the responsibility of the parties.

The question then is, Who should pay? It was Dr. Hurlbut who appealed to the Superior Court and ordered and paid for the transcript of the Board's proceedings. He argues, however, that he is the prevailing party and is entitled to recover costs under the principle of RCW 4.84.030. Dr. Hurlbut contends he is the prevailing party since before the Superior Court he asked that his permit be increased from moorage for 8 houseboats to moorage for 12, the Council wanted to go from 8 to 0, and the court entered a judgment for 8 houseboats. This argument fails to recognize that Dr. Hurlbut already had moorage for 8 houseboats under the Board's decision and that the Superior Court essentially affirmed the decision of the Board. Thus, Dr. Hurlbut did not prevail in his appeal; nor did the Council prevail in its appeal. The question of costs is remanded to the trial court with costs to be awarded consistent with this opinion.

With the exception of the order which required the Board to reimburse Dr. Hurlbut, the Superior Court is affirmed.

UTTER, C.J., and ROSELLINI, STAFFORD, WRIGHT, BRACHTENBACH, HOROWITZ, and HICKS, JJ., concur.