[No. 15862-1-II.   Division Two.   April 4, 1994.]

JEFFERSON COUNTY, ET AL, *Plaintiffs*, PROTECT LUDLOW BAY COMMITTEE, INC., ET AL, *Appellants*, v. SEATTLE YACHT CLUB, *Respondent*.

MORGAN, J., concurs in the result by separate opinion.

578

*Mark L. Huth, Prosecuting Attorney; David Alan Bricklin, Michael W. Gendler,* and *Bricklin & Gendler,* for appellants.

*Keith E. Moxon* and *Buck & Gordon,* for respondent.

ALEXANDER, J. — The Protect Ludlow Bay Committee, Robert W. Beckman, and Ronald Towery together appeal a judgment of the Jefferson County Superior Court affirming the Shorelines Hearings Board's order requiring Jefferson County to issue a shoreline substantial development permit to the Seattle Yacht Club. We reverse and remand to the Shorelines Hearings Board.

On July 15, 1987, the Seattle Yacht Club (SYC), a private organization which is headquartered on Portage Bay in Seattle, applied to Jefferson County for a shoreline substantial development permit to allow it to develop an outstation facility for the private use of its members on the southern shore of Port Ludlow Bay. Port Ludlow Bay is a picturesque 2.2-square-mile body of water located near the northern end of Hood Canal in eastern Jefferson County.[1]

---

[1]SYC operates other outstations in the waters of Washington and British Columbia. Apparently, SYC members have been cruising in their boats to Port Ludlow Bay for many years. SYC has leased moorage space from the Admiralty Resort Marina on the bay's north shore. In addition, SYC members commonly anchor their boats throughout the bay.

SYC's proposal envisioned a multifingered dock that would accommodate 20 boats, a "holding tank pump-out", and a "porta-potty dump station". SYC also planned onshore facilities consisting of restrooms, clubhouse, parking lot and, eventually, a caretaker's residence. The land-based portion of the outstation was to be built on three undeveloped lots that were located immediately to the east of an outstation that the Meydenbauer Yacht Club had maintained since 1970.

Because Jefferson County and SYC agreed that SYC's proposal had the potential to impact the surrounding environment, an environmental impact statement (EIS) relating to the proposal was prepared by the Jefferson County Planning Department. It dealt primarily with two issues: the effect of the development on the water quality of Port Ludlow Bay and the compatibility of the development with surrounding land uses. The planning department also prepared a staff report on the project, which included a list of 26 mitigating conditions that could be imposed if the project were approved. The report contained no recommendation as to whether the project should or should not be approved.

A 2-day public hearing on the proposal was held before the Jefferson-Port Townsend Shoreline Management Advisory Commission. At that hearing, Robert W. Beckman and Ronald E. Towery, as well as representatives of the Protect Ludlow Bay Committee (PLBC) and Pope Resources expressed opposition to the project, claiming that it would (1) adversely affect water quality in the portion of Port Ludlow Bay located near the proposed project, (2) be incompatible with the low density residential nature of the surrounding neighborhood, and (3) interfere with the public's access to the shoreline.[2]

Concluding that the project was incompatible with certain policies and standards of the Jefferson County Shore-

___

[2]PLBC is a nonprofit corporation formed for "the purpose of [monitoring] the environmental condition of Ludlow Bay". Beckman and Towery each own real property near SYC's proposed development. Pope Resources, a major landowner/developer in the Port Ludlow Bay area, is the owner of the Admiralty Resort Marina.

line Management Master Program (Master Program),[3] especially those relating to compatibility with the surrounding environment, the advisory commission recommended to the Jefferson County Board of County Commissioners that it deny the permit. The Board of County Commissioners agreed with that recommendation and denied SYC's application for a shoreline substantial development permit.

SYC sought review of the county commissioners' decision by the Shorelines Hearings Board (SHB). PLBC, Pope Resources, Beckman, and Towery intervened before the SHB in order to support Jefferson County's denial of the development permit. At the 5-day hearing that ensued before the SHB, SYC argued that the permit should be granted because the project (1) was consistent with the policies of the Shoreline Management Act of 1971 (SMA), RCW 90.58, and (2) had been approved for processing by the Jefferson County Planning Department before the 1989 revision of the Jefferson County Master Program, implying that the project was in compliance with the prior version of that plan. SYC also contended that the Jefferson County Board of County Commissioners violated the SMA when it denied the permit, because in so doing it was serving the interests of single family homeowners to the exclusion of the interests of the broader public.

After the public hearing, which focused primarily on water quality and environmental compatibility, the SHB found, in part, that:

---

[3]The Jefferson County Shoreline Management Master Program is the vehicle by which Jefferson County carries out its responsibilities under the Washington State Shoreline Management Act of 1971, RCW 90.58. Jefferson County's Master Program classifies environments into five categories. Shoreline areas are classified as "aquatic", whereas upland areas are classified as "urban", "suburban", "conservancy", or "natural". Master Program §§ 4.101-4.105. Applications are also classified within each shoreline designation according to the proposed use of the property. See Master Program §§ 4.201-4.205. The Master Program designates the southern shore of Port Ludlow Bay as suburban. The Meydenbauer facility is deemed a nonconforming use within the south shore's suburban designation. The more developed north shore of the bay is designated urban. In this context, suburban appears to mean residential. See Master Program § 4.104 (definition of a "suburban" environment).

## II

. . . .

Presently, the south side of [Port Ludlow] bay is given over to low density single-family residential development or is undeveloped. Pope is in the throes of changing that. . . . Along the south shore, approval has been obtained for Inner Harbor Village, a mixture of single-family and multi-family structures, which includes a sizable community center building. 800 new residential units are being developed on the south side by Pope Resources. . . .

. . . .

## IV

The east shore of the inner harbor is formed in part by a small peninsula which juts into Port Ludlow Bay from the south. . . .

On this peninsula now are several single family residences, some of which are served by individual boat docks. There is also a 270 foot floating dock connected to two lots owned by the Meydenbauer Bay Yacht Club, of Bellevue, Washington. This club, since 1970, has used its Port Ludlow Bay property as an outstation — transient moorage for members when in the vicinity. Meydenbauer's uplands contain an outdoor cooking and dining area, restrooms and storage facilities.

## V

The three lots immediately to the east of the Meydenbauer Bay Yacht Club property are, at this time, undeveloped. They have been purchased by the Seattle Yacht Club, which is headquartered on Portage Bay in Seattle. The Seattle Yacht Club desires to create another outstation on the site for its members. . . .

. . . .

## VII

The Seattle Yacht Club's proposed outstation . . . would involve construction of a multi-fingered dock, a clubhouse, restrooms, and a porta-potty dump station. A holding tank pump-out facility would be located on the outboard end of one of the dock fingers.

The dock would be constructed of floats fixed to piles. Typical dock width would be 6 feet. The dock would reach waterward a maximum of 150 feet from the mean lower low water (MLLW) line, providing . . . approximately 800 linear feet of moorage space. A 40 foot ramp would connect the dock to an upland walkway and deck. Electric power and waterlines would be provided to the dock.

The toilets and the porta-potty dump would be located on the deck at the end of the ramp (about 18 feet above MLLW) . . . .. The clubhouse would be further upgrade (about 40 feet above MLLW) . . . .. Six paved off-road parking stalls would be placed alongside the building.

. . . .

## VIII

The three lots which comprise the site of the Seattle Yacht Club's proposal contain approximately 1.72 acres, with about 255 linear feet of waterfront. The longest dimension inland from the shore is about 347 feet.

The land surface rises sharply from the water's edge and then slopes more gently upward as the distance from the shore increases. . . . The . . . vegetation on the site is thick, with numerous large conifers and significant undergrowth. . . .

The bay bottom in front of the lots is rocky and slopes moderately to minus 30 feet MLLW.

. . . .

## X

Robert W. Beckman owns the property immediately adjacent to the east of the Seattle Yacht Club lots. He has resided there with his family since the fall of 1987. They have a single family residence which commands a panoramic view of the bay to the west, north and east. In front of his home, he maintains his own pier and float. The most easterly finger pier of the Seattle Yacht Club proposal would come within 25 feet of Beckman's float.

## XI

Adjacent to the Meydenbauer Bay Yacht Club property on the west is a parcel owned by Ronald E. Towery. The Towerys do not presently reside on the property, but apparently intend to do so in the future. Currently they visit the property often on weekends. The property has a residence and a small dock. The Towerys purchased in April 1989.

. . . .

## XIII

In connection with consideration of the proposal at the local level, the Jefferson County Planning staff developed an extensive list of conditions which might be imposed if the project were approved. . . .

. . . Seattle Yacht Club has indicated a willingness to abide by the conditions proposed by the county staff. In conducting our review, we have evaluated the project as though these conditions were incorporated into the proposal.

The proposed conditions are the following:

6. *The pump-out facility shall be made available to members of . . . the general public. . . .*

. . . .

## XV

WATER QUALITY

In comparison with Puget Sound embayments, Port Ludlow Bay can be described as well-flushed. Generally the water quality there is high. However, in the past, elevated levels of fecal coliform were found in the vicinity of the Port Ludlow sewage treatment plant outfall and near the resort's marina.

Recently, Pope has upgraded the sewage treatment plant . . . [b]ut, the problem of fecal coliform loading in the bay from recreational boats remains.

There is a correlation between levels of fecal coliform and the number of boats in the bay. . . .

## XVI

Seattle Yacht Club members have been bringing their boats to Port Ludlow Bay for many years. With the increase of boaters generally, there has been a growth in use of the area by club members. . . .

Until recently the club leased space for five or six boats from the Admiralty Resort Marina. On peak weekends, this has meant that numerous club members have been anchoring their boats out in the bay.

## XVII

The resort's marina has a single pump-out facility for its entire 300 boat capacity. The testimony was that it is little used. The shoreside toilet facilities at the marina have in the past, been poorly maintained and are, in any event, inadequate to handle the large population of boaters who try to use them.

By virtue of a recent agreement with the Port Ludlow Bay Committee, Pope Resources has agreed not to seek further expansion of the marina for 10 years.

## XVIII

The Seattle Yacht Club asserts that the construction and use of its proposed outstation will have a positive effect on water quality. The premise is that boats moored near convenient land-based toilet facilities will contribute less pollution than those at anchor.

While we agree that this is probably true, we do not think that the existence of the yacht club's facility will necessarily reduce the number of boats at anchor.

The bay is now crowded on peak weekends . . .. We think it likely that boater usage of the bay . . . will continue to increase whether the yacht club's outstation is built or not.

## XIX

Much testimony was heard about the bad habits of boaters in regard to waste disposal, the problems of various kinds of marine sanitation devices, and the likelihood that any pump-out station will be used. There are, indeed, many variables in trying to determine the effectiveness of any strategy for curbing pollution from boats.

Despite the shortcomings of current efforts, we believe that the facilities to be installed at the proposed outstation must be viewed as a plus. The existence of well-maintained onshore toilet facilities near the dock is likely to reduce the volume of on-boat wastes which must be disposed of.

Moreover, the availability of convenient pump-out facilities for holding tanks is analogous to the availability of seat belts in

cars. Just because everyone doesn't use them doesn't mean they are not a good idea. Making the pump-out at the moorage available to the public at large provide[s] a service for the bay as a whole.

. . . .

## XX

In sum, the . . . boats to be moored at the outstation will probably contribute a lesser volume of pollutants than they would if they were anchored out. However, this must be viewed simply as a modest expansion of shoreside facilities in the context of an overall pattern of increased boater usage of the bay which will occur in any event. For the bay as a whole, the ameliorating effect of the outstation . . . is not likely to be substantial. On the other hand, the project, in itself, is not likely to significantly degrade the overall water quality of the bay.

## XXI

Our findings relating to probable water quality impacts are for the project as limited by the County's suggested conditions. However, we find that Condition 3, as presently worded, is incomplete and impractical. It would lead to unnecessary trips to the pump-out, thus, perhaps undermining its usefulness. Boats with holding tanks, having traveled to Port Ludlow Bay directly from Seattle, are not likely to need to visit the pump-out. Furthermore, all boats, not just those with macerator/chlorinator systems should be prohibited from discharging into the bay. Condition 3 should be modified to read as follows:

*All boats with Type III marine sanitation devices shall be required to use the pump-out whenever they are at the outstation with full or nearly full holding tanks. All boats, including those with macerator/chlorinator systems, shall be prohibited from discharging sewage, treated or untreated, into the waters of Ludlow Bay and the Inner Harbor.*

In addition, we think that whatever pollution control benefits may attend making the pump-out available to members ofd [ *sic*] the public would be offset by charging a fee for the service. In addition, a sign should be posted on the facility to alert the public of the availability of the pump-out. . . .

. . . .

## XXII

LAND USE COMPATABILITY

The Seattle Yacht Club already has in operation a number of other outstations in waters of Washington State and British Columbia. . . . The club's experience at these locations has been one of successful integration into the residential environments.

## XXIII

The proposed outstation is not a marina . . .. It has no commercial dimension. It is not a locale for purchasing . . . supplies. It is neither a fueling dock, nor a repair facility. No boat

launching will occur on site. No commercial boats will tie up there. No one will live permanently aboard a boat there.

The outstation is only a site for transient moorage with supporting upland facilities. Except for the short-term nature of the visits, the type of use is indistinguishable from that of a residential dock. . . .

### XXIV

The upland development at the outstation will readily fit into the residential neighborhood. The clubhouse . . . will approximate the appearance of a large residence. The building materials . . . are intended to blend the clubhouse and the other structures on site into the natural setting.

Except as necessary to build the restroom deck and walkway, vegetation seaward of the 35-foot contour will not be removed. . . .

Further, site obscuring buffer screens of conifers, rhododendrons and other native shrubs are to be maintained. . . .

Noise limitations will render the outstation property at least as quiet as the adjacent residential properties during the late evening, night and early morning hours. . . .

### XXV

The over water development at the outstation will occur in a bay which is already a significant center for boating recreation. The reasonable expectations of anyone moving to Port Ludlow Bay must include the understanding that boats — lots of them — are a . . . fact of life.

The nearshore placement of new moorage for up to 20 boats does not . . . constitute an incompatible intrusion on the aesthetics of the bay.

At present the boats tying up at the Meydenbauer Bay Yacht Club next door, engage in extensive rafting of their boats on peak weekends . . .. The Seattle Yacht Club's project will, to some degree, limit the rafting its neighbors can engage in. But, in terms of the visual effect, the change will not be a radical one at times when both facilities are full.

. . . .

### XXVI

. . . The proposed outstation will not intrude upon a bucolic rural preserve, but rather upon an area undergoing rapid land-based growth . . ..

. . . [T]he modest intensification of boat moorage represented by the Seattle Yacht Club proposal . . . does not appear out of harmony with the character of the neighborhood from a land use perspective.

### XXVII

The site itself is eminently well suited to the proposed use . . ..

The water depths are appropriate for moorage and the project can be constructed with no dredging or filling.

There are no significant shellfish resources on the property which might be disturbed. Recreational shellfish beds do exist around the east corner of the small peninsula, but there is no evidence that the new moorage will adversely affect them. . . .

## XXVIII

The Port Ludlow Bay Committee is concerned with cumulative and precedential effects of the Yacht Club's project on the south side of the bay.

We find that approval of this project will not, in all likelihood lead to the approval of others like it.

In the first place, Pope is bound by an agreement with the Port Ludlow Bay Committee to exclude docks from the [I]nner Harbor Village development, with the exception of three single family residential lots. Outside of the inner harbor, we were not apprised of suitable sights for another development of the type proposed on the south side.

Moreover, new restrictions on docks have been adopted as part of the Jefferson County Shoreline Master Program since the Yacht Club's application was filed. Under the new rules, a 60 foot length limit applies.

## XXIX

The Yacht Club's immediate residential neighbors, Beckmans and Towerys, bought into a situation where they should, upon reasonable inquiry, have been aware of the outstation plans. . . .

Significantly neither neighbor objects to the plans made for development of the Yacht Club's uplands. Their concerns are focused on the dock. For the Towerys, the development will lie behind a foreground already dominated by the Meydenbauer Bay dock, adding a modest additional assemblage of boats in the middle distance. As for the Beckman's [sic], while some of the boats moored next door will be close at hand, most of their panoramic view will remain unaffected. Neither the Towerys', nor the Beckmans' views will be dramatically impaired.

We find that the project will not create conditions substantially at odds with what the Beckmans and Towerys should have expected when they purchased.

Based on its findings, the SHB concluded, with one board member dissenting, that the proposal, subject to the mitigating conditions identified by the Jefferson County Planning Department, including the condition that SYC was to make its holding tank pump-out facility available to the general public,[4] complied with the SMA and the Jeffer-

---

[4]SYC was required to take certain actions to mitigate any adverse environmental impact which might be caused by the project. For example, it was to conduct baseline and ongoing water quality monitoring, and maintain vegetation seaward of the 35-foot contour line.

son County Shoreline Management Master Program and did not result in a severe degradation of the preexisting lifestyle in the area. It, therefore, remanded the matter to the Jefferson County Board of County Commissioners with directions to issue the permit to SYC.

The County, PLBC, Pope Resources, Beckman, and Towery appealed the SHB's decision to the Jefferson County Superior Court. After reviewing the record made before the SHB, the Superior Court affirmed the SHB's decision. Thereafter, PLBC, Pope Resources, Beckman, and Towery filed a notice of appeal and petitioned for direct review by the Washington Supreme Court. That court declined review and transferred the appeal to this court.[5]

PLBC, Beckman, and Towery contend that the Superior Court erred in affirming the SHB's ruling, asserting that the SHB committed an error of law in approving SYC's proposal because it: (1) relied on an adjacent nonconforming use (*i.e.*, the Meydenbauer outstation) as a basis for finding that the proposed project was compatible with the surrounding environment; (2) relied on the project's alleged compatibility with distant upland and far shore uses while ignoring its incompatibility with adjacent and nearby uses; and (3) ignored the precedential and cumulative effects of the project in a residential community. PLBC, Beckman, and Towery also contend that several of the SHB's factual findings are not supported by substantial evidence;[6] that the SHB erred in excusing potential localized shoreline pollution on the basis that water quality standards, averaged

---

[5]Jefferson County was not a party to the petition for direct review by the Washington Supreme Court, nor has it filed a brief with this court. Likewise, shortly after the petition for review was filed, Pope Resources voluntarily withdrew from participation in the appeal.

[6]PLBC, Beckman, and Towery assigned error to findings of fact 2, 17, 19, and 20-29. However, because their brief only contains argument regarding findings 2, 20, 22, 25, and 28-29, we need not address their challenge to the other findings. See RAP 10.3(a)(5); *American Legion Post 32 v. Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991). Additionally, to the extent the Appellants' assignments of error present legal questions, they are addressed without reference to specific findings.

throughout the bay, would not be adversely affected; that the Superior Court erred in deferring to the SHB's interpretation of the Master Program rather than to the County's interpretation; and that the proposed project is inconsistent with the requirements of the Jefferson County Shoreline Master Program and the public access policies of the SMA.

# I

## SCOPE OF REVIEW

■ Judicial review of a decision of the SHB is governed by the Administrative Procedure Act (APA), RCW 34.05. *See* RCW 90.58.180(3). Review is of the record of the agency, in this case the SHB, not the trial court record. *See* RCW 34.05.558; *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 323-24, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983).

■ ■ Legal determinations of administrative agencies are reviewed under an error of law standard, which permits a reviewing court to substitute its judgment for that of the agency. *See Haley v. Medical Disciplinary Bd.*, 117 Wn.2d 720, 728, 818 P.2d 1062 (1991); *see also Macey v. Department of Empl. Sec.*, 110 Wn.2d 308, 313, 752 P.2d 372 (1988).[7] Substantial weight should, however, be accorded to the agency's legal interpretation if it falls within the agency's expertise in a special area of law. *See Macey*, 110 Wn.2d at 313. An agency's factual findings are reviewed under a substantial evidence standard. *See generally* RCW 34.05.570(3)(e). Evidence is substantial if it would convince an unprejudiced, thinking mind of the truth of the declared premise. *See Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d 477, 486, 805 P.2d 800 (1991).

■ ■ Every project for which a shoreline substantial development permit for secondary uses[8] is sought must be consistent with both the applicable shoreline master pro-

---

[7]*Macey* and some other APA cases cited herein were decided under the former administrative procedure act, RCW 34.04. They are, however, still applicable. *See* RCW 34.05.001.

[8]It is undisputed that the proposed use satisfies the Master Program's definition of a "secondary" use.

gram, in this case the Jefferson County Shoreline Management Master Program, and RCW 90.58, the SMA. *See* RCW 90.58.140; Master Program § 4.202. The interpretation of a statute is a question of law. *See American Legion Post 32 v. Walla Walla,* 116 Wn.2d 1, 5, 802 P.2d 784 (1991). The proper interpretation of a master program provision is likewise a question of law. *See Nisqually Delta Ass'n v. DuPont,* 103 Wn.2d 720, 730, 696 P.2d 1222 (1985). Although the SHB's interpretation of the SMA is entitled to due deference, the reviewing court may, where necessary to ensure that a proposed project complies with the SMA, substitute its judgment for that of the agency. *See generally Haley,* 117 Wn.2d at 728.

## II

### PUBLIC ACCESS

█ PLBC, Beckman, and Towery contend that the SHB erred in concluding that SYC's proposed development complied with the public access requirements of the SMA. They argue that the project will interfere with the public's access to public waters with no mitigating public benefit. A provision in the SMA, RCW 90.58.020, provides that priority should be given to, among other things, "development that will provide an opportunity for substantial numbers of the people to enjoy the shorelines of the state." That same statute also provides that permitted uses in the shorelines of Washington shall be designed and conducted in a manner to minimize, insofar as practical, any interference with the public's use of the water. *See* RCW 90.58.020. The Shoreline Management Act of 1971 does not, however, mandate a calculation of equal public benefits to be offset against private benefits. *See Portage Bay-Roanoke Park Comm'ty Coun. v. Shorelines Hearings Bd.,* 92 Wn.2d 1, 5, 593 P.2d 151 (1979); *see also Department of Ecology v. Ballard Elks Lodge 827,* 84 Wn.2d 551, 558-59, 527 P.2d 1121 (1974) (SHB's decision that private fraternal organization's overwater club facilities complied with RCW 90.58.020 was not clearly erroneous).

We are not convinced that the SHB erred in concluding that the proposed project satisfied the public access requirements of the SMA. The outstation, as it was ultimately approved, will increase the public's access to the shoreline to a degree. For example, the existence of the outstation will have the effect of increasing the number of moorage spaces available to the general public at the Admiralty Resort Marina. That is so because SYC members who currently occupy temporary spaces at the Admiralty Resort will, presumably, now moor their boats at the SYC facility. Furthermore, members of the SYC are part of the public, and the proposed outstation will increase their access to the shoreline. *See Ballard Elks.* As an additional public benefit, the holding tank pump-out facility which is a feature of the project will be available to the public free of charge.

## III

### THE COMPATIBILITY OF SYC'S PROPOSAL WITH THE SURROUNDING ENVIRONMENT

A. Reliance by SHB on Adjacent Nonconforming Uses in Determining the Proposed Outstation's Compatibility With the Surrounding Environment

Pursuant to section 4.10 of the Jefferson County Shoreline Management Master Program, proposed projects must be consistent with the policies governing the affected shoreline environments. Moreover, applicants for shoreline substantial development permits for secondary uses have the burden of demonstrating, among other things, that "[t]he proposed project will . . . be compatible with other *permitted* uses in the area." Master Program § 4.202, criterion 3. (Italics ours.) Here, it is undisputed that the proposed outstation is a secondary use within the south shore's suburban designation.

PLBC, Beckman, and Towery contend that the SHB erred in relying on an adjacent "grandfathered" nonconforming use (*i.e.*, the Meydenbauer Bay Yacht Club outstation) in determining that the SYC's proposal was compatible with the surrounding environment.[9] They also make the related

---

[9]A nonconforming use is a use which lawfully existed prior to the enactment of a zoning ordinance or resolution, which is maintained after the effective date

argument that the SHB erred in basing its compatibility determination on the existence of the Meydenbauer facility because that facility is, as a practical matter, incompatible with the surrounding area. The principal issue we must confront is whether a nonconforming use constitutes a "permitted use" for purposes of a Master Program § 4.202 compatibility analysis; and if not, whether it was relied upon by the SHB.

PLBC, Beckman, and Towery assert that a nonconforming use is not a permitted use. We agree. Because nonconforming uses are disfavored, and because the public policy of this state is to restrict such uses so that they may ultimately be phased out, *see, e.g., Keller v. Bellingham*, 20 Wn. App. 1, 9, 578 P.2d 881 (1978), *aff'd*, 92 Wn.2d 726, 600 P.2d 1276 (1979), we believe that nonconforming uses are not precedent for other uses. That is, a finding of compatibility cannot, in our view, be substantially based on the existence of a nonconforming use in the area in question.

In its finding of fact 25, the SHB found that the proposed project will not have a "radical" adverse visual effect on the local area because "the boats tying up at the Meydenbauer Bay Yacht Club next door, [already] engage in extensive rafting of their boats on peak weekends . . .." Similarly, in finding of fact 29, the SHB found that the Towerys' concerns about the water based aspects of SYC's proposal were less significant because the water based development "will lie behind a foreground already dominated by the Meydenbauer Bay dock . . .." In that same finding the SHB dismissed the Beckmans' concerns about their view stating that "while some of the boats moored next door will be close at hand, most of their panoramic view will remain unaffected".

In our judgment, the SHB substantially relied on the nonconforming Meydenbauer facility as justification for what can only be described as further aesthetic degradation

---

of the ordinance or resolution, although it does not comply with the use restrictions applicable to the area in which it is situated. *See, e.g., Andrew v. King Cy.*, 21 Wn. App. 566, 570, 586 P.2d 509 (1978), *review denied*, 91 Wn.2d 1023 (1979).

of the area immediately adjacent to the site of the proposed project. That was an error of law.

B. What "Area" Should the SHB Consider?

PLBC, Beckman, and Towery also contend that the SHB committed an error of law in basing its compatibility findings 20, 25, and 29 on a large scale, areawide approach rather than focusing on the proposed project's compatibility with permitted uses within the immediate vicinity of the proposed project. Again, we agree with the Appellants. Master Program § 4.202 (criterion 1) requires applicants for a shoreline substantial development permit for secondary uses to demonstrate that their proposed projects "will not be . . . contrary to the goals, policies, and performance standards . . ." of the Master Program. Section 5.60 (policy 1) of the Master Program indicates that the type, design, and location of docks and piers "*should be compatible with the shoreline area where they are located*", and that consideration should be given to shoreline characteristics, tidal action, aesthetics, adjacent land and water uses, and the like. (Italics ours.) Section 5.60 (policy 4) states that "[i]n permitting boat docking facilities, Jefferson County . . . should consider the capacity *of the shoreline sites* to absorb the impact of waste discharges from boats, including gas and oil spillage". (Italics ours.) Likewise, section 5.60 (performance standard 3) of the Master Program specifically requires that docks and piers be located, designed, and operated "to not unnecessarily interfere with rights of adjacent property owners, nor interfere with adjacent water uses."

The SHB's finding of fact 20 states in part that "the project, in itself, is not likely to significantly degrade the overall water quality of the bay". Similarly, finding of fact 25 states in part that:

> [t]he over water development at the outstation will occur in a bay which is already a significant center for boating recreation . . ..
>
> The nearshore placement of new moorage for up to 20 boats does not . . . constitute an incompatible intrusion on the aesthetics of the bay.

Finding of fact 29 states in part that "[f]or the Towerys, the development will lie behind a foreground already dominated by the Meydenbauer Bay dock, adding a modest additional assemblage of boats in the middle distance."

■ As we have noted above, Jefferson County's Master Program requires projects to be compatible with the area where the development is to be located. Because these findings indicate that the SHB, when doing its compatibility analysis, focused to a large degree on the project's compatibility with the bay as a whole rather than on its impact on the area immediately adjacent to the proposed site, the findings do not support the SHB's determination that SYC's proposed outstation complied with the SMA and Jefferson County's Master Program, and did not result in severe degradation of the preexisting lifestyle in the area.

Although in reaching our decision we have relied primarily on the SHB's errors of law in considering a nonconforming use and too broad an area in making its compatibility analysis, there is certainly some merit to the Appellants' contention that from a factual standpoint, this project simply does not fit the area into which it would be inserted. That was the view taken by the dissenting SHB member, Judith Bendor, who noted that:

> this 20-boat facility is simply too large for its setting. The outstation is to be located in a residential area, one designated suburban under the Jefferson County Shoreline Master Program. The Yacht Club's property has a shoreline frontage of 255 feet. The dock structure across the shoreline will cover 215 feet, or 85%. On summer weekends the Beckmans' view will be dominated by this facility.
>
> In addition, evidence showed that docked boats will release "gray water" when people shower or wash. This water is released untreated, and despite the presence of soap, is contaminated. Moreover, it is unrealistic to assume that during the night, boaters will leave their quarters, walk to the head of the dock, and climb 18 vertical feet of stairs to use the on-shore toilet facilities. If their boats did not have holding tanks, there would be a release of sewage while docked. In addition, there would be an aesthetic impact on the shoreline area from the release of soapy water.
>
> . . . .

CONCLUSION

The applicable provisions of the SMA and the Jefferson County Shoreline Master Program seek to strike a balance between development and protection of the existing environment. To maintain this balance, consideration of a proposed project's compatibility with the area immediately adjacent to the project site should be paramount. While consideration of a project's compatibility with more distant uses might be useful in certain instances, consideration of such information must be in addition to, not in lieu of, an evaluation of a project's compatibility with permitted land and water uses in the area immediately adjacent to the project site. This is essential because if too broad a view is taken when a permit application is evaluated for compatibility with the SMA and the applicable shoreline master program, almost any project can be justified. Such an approach would undermine the protections the aforementioned enactments are intended to provide to individual local shoreline environments.

In our view, the SHB erred in substantially relying on overall water quality in the bay, distant land uses, and the nonconforming Meydenbauer facility in determining that SYC's proposed outstation complied with the SMA and the Jefferson County Shoreline Master Program. Accordingly, the Superior Court order affirming the SHB's decision is reversed and the matter is remanded to the SHB with directions to reconsider the proposal's compatibility with the area immediately adjacent to the proposed site without considering any nonconforming use.

Reversed.

SEINFELD, J., concurs.

MORGAN, C.J. (concurring) — I agree with the majority that the Shoreline Hearings Board (SHB) erred by considering the existence of the Meydenbauer facility. The Meydenbauer facility is a nonconforming use, and as a matter of law, a nonconforming use should not be the basis for finding that a project is compatible with the surrounding area.

I agree with the majority that the SHB did not err in determining "that the proposed project satisfied the public access requirements of the SMA [Shoreline Management Act of 1971]." Majority, at 590. The majority does not state whether it considers the Board's determination to be a matter of law or a matter of fact, but either way the determination is supportable.

I disagree with the majority that the SHB erred by basing its compatibility findings on an area that was too wide. Nothing in the law says that the SHB must look at surrounding property within 100 yards, 1,000 yards, or 12,000 yards. How to define the relevant area is necessarily a matter involving much discretion and, further, a question that depends on all the facts and circumstances of the case. Necessarily, it is a matter for the discretion of the trier of fact, and the trier of fact is the SHB. This court can override the SHB only if no reasonable person would have decided as the SHB did,[10] yet the majority opinion does not even attempt to meet this standard. It simply substitutes the majority's view of the facts for the Board's view of the facts.

In conclusion, I agree that the case must be remanded to the Board for reconsideration. I agree that the Board should be instructed not to consider the existence of the Meydenbauer facility. In all other respects, I believe the Board should be allowed to exercise its discretion in the manner provided by law.

Review denied at 124 Wn.2d 1029 (1994).

---

[10]This is the same as saying that this court can override the SHB only if there is no substantial evidence, or if the SHB acted arbitrarily or capriciously. *See* RCW 34.05.570(3).