[No. 24401-2-II.    Division Two.    March 31, 2000.]

BELLEVUE FARM OWNERS ASSOCIATION, *Appellant*, v. THE SHORELINES HEARINGS BOARD, ET AL., *Respondents*.

342

*Glenn Jay Amster* and *Michael Barr King* of *Lane Powell Spears Lubersky, L.L.P.*, for appellant.

*Randall K. Gaylord, Prosecuting Attorney*, and *John T. Krall, Deputy*, for respondent San Juan County.

*Christine O. Gregoire, Attorney General*, and *Jean Marie Wilkinson, Assistant*, for respondent Shorelines Hearings Board.

*Peter J. Eglick* of *Helsell Fetterman, L.L.P.*, for respondents Wescott Bay Sea Farms Limited Partnership and Friends of the San Juans.

*Christine O. Gregoire, Attorney General*, and *Kathryn L. Gerla, Assistant*, on behalf of the Department of Ecology, amicus curiae.

*Brian Lee Holtzclaw* on behalf of the Washington State Association of Realtors, amicus curiae.

HUNT, J. — Bellevue Farm Owners Association appeals denial of a shoreline substantial development permit to

build a 345-foot dock over partly public tidal mudflats on Westcott Bay, San Juan Island. We hold that the county's threshold determination of nonsignificance (DNS) did not preclude the Shoreline Hearings Board's (Board) independent review of the application. Finding the Board's decision supported by the record and the law, we affirm its denial of the permit.

## FACTS
### I. THE SITE
#### A. The Association Property

Members of the Bellevue Farm Owners Association (the Association) individually own residential lots in an 11-lot subdivision at the head of Westcott Bay, San Juan Island. The subdivision comprises 54 acres, with 2100 feet of shoreline, wetlands, and a tidal marsh (the Property). The Property has a shoreline designation of Natural, Conservancy, and Suburban.[1] A conservation easement for the San Juan County Preservation Trust[2] limits development on the Property and permanently sets aside sensitive areas.[3]

#### B. Westcott Bay

Westcott Bay (the Bay) is located at the northwest end of San Juan Island. It extends in a northeasterly direction from its mouth on Mosquito Pass. The Property abuts the bay's very shallow foot. The Bay contains extensive intertidal[4] mudflats. The Property includes the mudflats from the Property's shoreline seaward to mean low tide.[5] Beyond that point seaward, the mudflats and tidal water are public

---

[1] San Juan County Shoreline Master Program (SJCSMP) 16.40.403, .405-.406.

[2] San Juan County Auditor's File #91175088, recorded Aug. 22, 1991.

[3] Sensitive areas on the Property include wetlands, archaeological, and agricultural sites.

[4] SJCSMP defines intertidal as, "the area between the line of extreme low tide and the line of ordinary high tide."

[5] Mean low tide is the average of low tides measured over time. *NOAA Ctr. for Operational Oceangraphic Prods. & Servs.* (Jan. 26, 2000), *available at* http:// www.co-ops.nos.noaa.gov/tideglos.html.

tidelands;[6] seaward from extreme low tide the tidal waters are designated Shorelines of Statewide Significance.[7]

San Juan County designated the Bay a "conservancy" area because of its importance as an aquatic area; its historic, educational and/or scientific value; its high scenic value; and its relatively natural state.[8] The Bay is highly productive for marine life, providing shellfish beds, spawning habitat for herring, and habitat for seabirds and marine mammals.

The shoreline is relatively undeveloped, except for a large dock owned by Westcott Bay Sea Farms,[9] which supports an aquaculture operation. That dock is "a grandfathered structure,"[10] built before enactment of the Shoreline Management Act (SMA). It is situated midway along the south shore of the Bay, southeast from the Property. The Sea Farms' dock is shorter than the Association's proposed dock, closer to deeper water, and traverses significantly less public tideland.

## II. THE PROPOSED DOCK

The Property's original plat dedicated common areas for

---

[6]An older deed shows the property line terminating at extreme low tide. It states in pertinent part: "[A]ll tide lands of 2″ class owned by . . . mean 1 [low] tide & extr 1 [low] tide front of Lots 3 & 4, 14, lots 1, 2, [encompasses Bellevue Farms property]." Whether the "line" is measured from mean low tide or extreme low tide is not germane to analysis of this case.

[7]This designation is given to saltwater areas surrounding all San Juan Islands seaward from extreme low tide.

[8]The purpose of the conservancy designation "is to protect, conserve, and manage existing natural resources and systems and/or valuable historic, educational or scientific research areas without precluding compatible human uses."

[9]The Bay also contains one small residential dock, measuring 115 feet in length. It is located southwest of the Association property, near the mouth of the bay.

[10]"Grandfather" means "[t]o cover (a person) with the benefits of a grandfather clause." A "grandfather clause" is "[a] statutory or regulatory clause that exempts a class of persons or transactions because of circumstances existing before the new rule or regulation takes effect." BLACK'S LAW DICTIONARY, 706 (7th ed. 1999).

community recreation. Although the plat included a proposed dock, no permit application for this dock had been filed nor had any permit been approved. The initial design called for a 593-foot dock, "with a floating finger pier to accommodate 18 slips [and] large recreational vessels." A primary purpose for the dock was to eliminate residents' need to walk across the mudflats in order to launch dinghies at low tide.

In response to citizen concerns, the Association shortened the dock design to 375 feet. The Department of Fish and Wildlife opposed the 375-foot dock because the end float would shade eelgrass beds.[11] The dock was further reduced to 345 feet, which provided a sufficient setback to protect the eelgrass.

The 345-foot dock would include 230 feet of six-feet wide fixed pier, elevated five to eight feet above the water's surface at high tide.[12] The pier would connect to a 45-foot ramp leading to a 75-foot float, with zero to one foot of water below during minus tides. Below a .4 minus tide, the seaward end of the float would rest upon public tidelands and shellfish beds. To foster herring spawn in the Bay, the Association has agreed to remove the float from January 1 until March 15 each year. A drawing of the proposed 345-foot dock follows:

---

[11]The eelgrass beds provide critical habitat for spawning herring and cover for young herring and other small fishes. Marine snails also lay their eggs in eelgrass beds.

[12]Association President Bradford G. Augustine testified that "[a]t a minus two tide there's no water [under the dock]. . . . At a minus one tide there's approximately a foot of water." In 1996, the estimated number of minus 2 tides was approximately 16. The dock is designed to be five feet over the water at mean higher high water, which is "the average of the higher high water height of each tidal day observed." *NOAA Ctr. for Operational Oceanographic Prods. & Servs.* (Jan. 26, 2000), *available at* http://www.co-ops.nos.noaa.gov/tideglos.hmtl.

Exhibit A1: Drawing of proposed dock.

## III. PROCEDURE
### A. Below

The San Juan County planning department (the County) conducted the required State Environmental Policy Act (SEPA) review[13] and issued a determination of nonsignificance (DNS).[14] The County Hearing Examiner denied the Association's permit application to build the dock:

> Under the facts, in this shallow, undeveloped, highly sensitive Conservancy area, the marginal convenience that a 345 foot dinghy dock will provide is outweighed by the risks created, the aesthetic impacts and the possibility of setting a precedent, leading to in time to adverse cumulative effects.

The Association appealed to the San Juan County Commissioners, who upheld the Hearing Examiner's denial. The Association appealed to the Board, which upheld the County's denial of the permit, in part because the dock would have a negative impact on scenic views.

### B. Appeal

The Association appealed to the Thurston County Superior Court, which affirmed the Board's decision. The Association moved for direct review by the Washington Supreme Court, which denied the motion and transferred the case to us.

The Association argues: (1) The County's DNS, finding no significant impact on scenic view, was binding on the Board; (2) the County's scenic view ordinance lacked ar-

---

[13]SEPA rules establish a lead agency responsible for compliance with SEPA procedures, the threshold determination, and, if necessary, preparing an EIS. When both state and local agencies are required to issue permits, the local agency is usually the lead agency.

[14]The DNS states in pertinent part:

> San Juan County, the lead agency for this proposal, has determined that it will not have a probable significant adverse impact on the environment. An environmental impact statement (EIS) will not be required. This determination was made after review of a completed environmental checklist and other information on file at the San Juan County Planning Department.

ticulable standards, rendering it void for vagueness; (3) the Board erred in finding the dock would have significant impact on scenic views; (4) the Board misinterpreted the SAN JUAN COUNTY MUNICIPAL CODE (SJCMC) when it required the Association to demonstrate the necessity of the dock; and (5) the Board erred in denying the Association's permit because of precedential impact.

Respondents—the Board,[15] San Juan County, Friends of the San Juans,[16] and Westcott Bay Sea Farms—pose various arguments, including: (1) The DNS merely allowed the proposal to avoid an environmental impact statement (EIS); (2) the Association misconstrued WAC 197-11-390; (3) the SMA and San Juan County Shoreline Master Plan (Shoreline Master Plan) provided adequate guidelines for denying the Association's permit; and (4) the Board properly interpreted and applied the Shoreline Master Plan.

Respondents further argue: (1) There are available alternatives to the dock, such as pushing the dinghies across the mudflats at low tide or waiting for high tide; (2) the County's plan—to preserve the natural shoreline and scenic vistas and to concentrate dock development in areas already developed—outweighs the convenience of a few private dinghy owners seeking a "bridge-like" dock across primarily public tidelands; and (3) approval of this dock would establish a precedent for other similar applications, which would produce a "porcupine" effect along a conservancy-designated shoreline that the County seeks to protect. Respondents also seek attorney fees.

## ANALYSIS
## I. LAW AFFECTING SHORELINE DEVELOPMENT
### A. SEPA

SEPA provides the basic structure for review of major

---

[15]The Board appealed only the issue of whether it was bound by the County's DNS.

[16]Friends of the San Juans is a nonprofit organization that has monitored land use and shoreline planning in the San Juans since 1979.

land use development proposals, both public and private, shoreline and inland, that have significant impact on the environment.[17] Chapter 43.21C RCW. SEPA requires the "lead agency"[18] to make a threshold determination— whether an EIS is required for the proposed project. RCW 43.21C.033; WAC 197-11-310, -330. The lead agency uses an environmental checklist to review the project's "proposed activities, alternatives, and impacts . . . in accordance with SEPA's goals and policies."[19] WAC 197-11-060, -315. If the lead agency determines that the project will not have a probable significant adverse environmental impact, it issues a DNS, and an EIS is not required.[20] RCW 43.21C-.030, .031; WAC 197-11-340.

## B. SMA

■ Shoreline development in Washington must not only comply with SEPA, but it must also be consistent with the SMA and local governments' corresponding shoreline master programs. *Overlake Fund v. Shoreline Hearings Bd.*, 90 Wn. App. 746, 753, 954 P.2d 304 (1998); RCW 90.58-.140(1). The SMA recognizes the shorelines' fragile nature, the increased demand for their use, and the necessity of a coordinated state and local effort to manage and to protect

---

[17]Lori A. Terry, *SEPA: A Proposed Standard for Judicial Review of Agency Decisions Not to Require Preparation of a Supplemental Environmental Impact Statement*, 15 U. PUGET SOUND L. REV. 957, 957-58 (1992).

[18]The lead agency is responsible for complying with SEPA's procedural requirements. WAC 197-11-050(2).

[19]WAC 197-11-060 provides further instruction:

This section specifies the content of environmental review common to *all* environmental documents required under SEPA.

(2) The content of environmental review:

(a) Depends on each particular proposal, on an agency's existing planning and decision-making processes, and on the time when alternatives and impacts can be most meaningfully evaluated;

(b) For the purpose of deciding whether an EIS is required, is specified in the environmental checklist, in WAC 197-11-330 and 197-11-444[.]

[20]Conversely, if determined to have a probable significant adverse environmental impact, an EIS is required.

this resource. *Buechel v. Department of Ecology*, 125 Wn.2d 196, 203, 884 P.2d 910 (1994). Underlying this policy is the state's goal to manage shorelines "by planning for and fostering all 'reasonable and appropriate uses.' " *Buechel*, 125 Wn.2d at 203 (citing RCW 90.58.020). "The SMA is to be broadly construed in order to protect the state shorelines as fully as possible." *Buechel*, 125 Wn.2d at 203.

A shoreline developer must first obtain a permit from the local government, which may grant a permit only if the proposal meets both SMA and applicable local shoreline master program requirements. *Buechel*, 125 Wn.2d at 204 (citing RCW 90.58.140; *Nisqually Delta Ass'n v. City of DuPont*, 103 Wn.2d 720, 724, 696 P.2d 1222 (1985)). Persons aggrieved by the local government's denial or grant of a shoreline development permit can seek review by the Board. RCW 90.58.180; *Buechel*, 125 Wn.2d at 204.

■ The Board is a quasi-judicial body that specializes in hearing shoreline cases; it reviews de novo the denial or grant of a shoreline substantial development permit. *Buechel*, 125 Wn.2d at 202, 204. A party can seek superior court review of the Board's denial or grant of a shoreline development permit. RCW 90.58.180. Permit applicants bear the burden of proving that the proposal is consistent with both the local shoreline master plan and the state shoreline management act. *Buechel*, 125 Wn.2d at 205 (citing RCW 90.58.140(7), .180(1), (2)).

## II. DNS DOES NOT PRECLUDE OTHER ENVIRONMENTAL REVIEW

The reach of the following WAC provision, promulgated by Ecology,[21] is in issue here:

> When the responsible official makes a threshold determination, it is final and binding on all agencies, subject to the provisions of this section and WAC 197-11-340, 197-11-360, and Part Six.

---

[21]RCW 90.58.200 grants Ecology the power to adopt rules to implement and carry out the SMA.

352

WAC 197-11-390 (1).[22] The Association contends that under this provision, the County's DNS compelled the Board, "an agency," to grant the Association's dock permit. But the Association's cited case law[23] fails to support its contention that a DNS precludes another agency's denial of a permit based on environmental impacts reviewed under legislation other than SEPA.

The Board argues that we should follow Ecology's interpretation of its own rule,[24] citing *Federated American Insurance Co. v. Marquardt*, 108 Wn.2d 651, 656, 741 P.2d 18 (1987). Ecology suggests we interpret WAC 197-11-390 consistent with its enabling act, "to mean that a threshold determination is final and binding for purposes of agencies' SEPA procedural authority. . . . [I]f a DNS is issued, agencies may not repeat the threshold determination process or require an EIS."[25] The Board asserts that because Ecology adopted WAC 197-11-390 under SEPA (ch. 43.21C RCW), this binding-on-other-agencies directive applies only to determinations made under SEPA, such as a determination of significance (DS) or DNS; and it does not restrict determinations made under other environmental schemes, such as the SMA.[26] The Board further asserts that it has independent jurisdiction to consider and to

[22]WAC 197-11-340 and 360 discuss determinations of nonsignificance and significance, respectively; Part Six discusses when to use existing environmental documents.

[23]The Association cites *Leavitt v. Jefferson County*, 74 Wn. App. 668, 680, 875 P.2d 681 (1994), which cites WAC 197-11-390(1) without discussion.

[24]The Board offers two other cases where Ecology disapproved shoreline permits, despite the local agency's DNS. *Cassinelli v. City of Seattle*, Nos. 93-46 & 93-47 (Shorelines Hearings Board Sept. 7, 1994), *reprinted in* 6 WASH. STATE ENVIRONMENTAL LAW REPORTER (1992); *Wiswall v. Clark County & State Dep't of Ecology*, No. 90-37 (Shorelines Hearings Board June 28, 1991), *reprinted in* 5 WASH. STATE ENVIRONMENTAL LAW REPORTER (1995).

[25]In its amicus brief, Ecology argues that, if adopted, the Association's and the Realtors' contention, that a DNS is binding on all agencies, would effectively transfer to the lead agency Ecology's power to administer all of Washington's environmental laws, state and local. Additionally, such transfer of power would make the lead agency the sole source of environmental review for a project requiring permits or approvals from multiple entities, contrary to the Legislature's intent. For example, the Department of Fisheries separately had to issue a Hydraulic Project Application for the Association's dock. RCW 75.20.100.

[26]An agency has jurisdiction if it must issue permits or approvals for the project. WAC 197-11-714(3). But another agency with SEPA jurisdiction cannot change a DNS, unless it assumes lead agency status. WAC 197-11-390(2)(b). If another agency assumes lead status under WAC 197-11-948(1), the new lead agency

apply the environmental criteria specified in both the SMA and the San Juan County's Shoreline Master Program (SJCSMP), in addition to the SEPA criteria. *See* RCW 90.58.170, .180(1).

The Legislature has voiced its intent regarding SEPA's interplay with other agencies and other environmental regulation:[27]

> The legislature intends that a primary role of environmental review under chapter 43.21C RCW is to focus on the gaps and overlaps that may exist in applicable laws and requirements related to a proposed action. The review of project actions conducted by counties, cities, and towns planning under RCW 36.70A.040 should integrate environmental review with project review. Chapter 43.21C RCW *[SEPA] should not be used as a substitute for other land use planning and environmental requirements.*

LAWS OF 1995, ch. 347, § 201(2) (emphasis added). Similarly, RCW 43.21C.050, provides:

> Nothing in RCW 43.21C.030 [Guidelines for state agencies, local governments] or 43.21C.040 [Examination of law, regulations, policies] shall in any way affect the specific statutory obligations of any agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other public agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other public agency.

RCW 43.21C.050. *See* RCW 43.21C.060.

---

can review the underlying materials and reverse the first lead agency's DNS. The new lead agency can then order preparation of an EIS. WAC 197-11-948(2).

[27]SEPA was modeled after the federal National Environmental Protection Act (NEPA), 42 U.S.C. §§ 4321-4370d. *Juanita Bay Valley Community Ass'n v. City of Kirkland*, 9 Wn. App. 59, 68, 510 P.2d 1140 (1973). When a state law is modeled after a federal law, federal legislative history is relevant. *Everett Concrete Prods., Inc. v. Department of Labor & Indus.*, 109 Wn.2d 819, 823, 748 P.2d 1112 (1988).

> The prime sponsor of NEPA, Senator Henry M. Jackson, stated: "The bill specifically provides that its provisions are *supplemental* to the existing mandates and authorizations of all Federal agencies. This constitutes a statutory enlargement of the responsibilities and the concerns of all instrumentalities of the Federal Government." 115 Cong. Rec. 19,009 (daily ed. July 10, 1969).

*Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 276, 525 P.2d 774 (1974) (emphasis added).

The Washington Supreme Court is in accord:

> SEPA is essentially a procedural statute to ensure that environmental impacts and alternatives are properly considered by the decisionmakers. It was not designed to usurp local decisionmaking or to dictate a particular substantive result.

*Save Our Rural Env't v. Snohomish County*, 99 Wn.2d 363, 371, 662 P.2d 816 (1983) (citations omitted).[28]

> SEPA [determinations] are uniquely related to the particular decision being taken, and are conclusive only for that purpose. They are not binding on other decision-making bodies. To hold otherwise would allow one decision-making body to preempt the authority of any other decision-making body considering a related question to evaluate a particular environmental issue, and would foreclose independent analysis and deliberation. Such a result could contravene the clear intent of SEPA to infuse every governmental exercise of discretion with consideration of environmental amenities and values. *See* RCW 43.21C.030.

*Department of Natural Resources v. Thurston County*, 92 Wn.2d 656, 667, 601 P.2d 494 (1979).

Consistent with the Supreme Court, we have previously ruled:

> A local government may condition or deny a proposal based on adverse environmental impacts which make the action inconsistent with previously adopted local SEPA policies, even if the project complies with local zoning and building codes.

*Adams v. Thurston County*, 70 Wn. App. 471, 476, 855 P.2d 284 (1993) (citations omitted).

---

[28]*See also Department of Natural Resources v. Thurston County*, 92 Wn.2d 656, 666, 601 P.2d 494 (1979) (SEPA is a supplement to the statutory authority of each agency); *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 65, 578 P.2d 1309 (1978) (SEPA adds to authority and overlays preexisting requirement); *City of Bellevue v. King County Boundary Review Bd.*, 90 Wn.2d 856, 865, 586 P.2d 470 (1978) (SEPA analysis required in addition to consideration of factors in annexation statute); *Sisley v. San Juan County*, 89 Wn.2d 78, 83, 569 P.2d 712 (1977) (SEPA supplements the permit system of the SMA).

■ Washington's legislature, courts, and state agencies recognize that, with the exception of avoiding an EIS, a DNS does not bind subsequent agencies that independently assess shoreline development applications. Accordingly, the County's DNS[29] did not otherwise constrain the Board in its review of the Project.

## III. THE BOARD'S DECISION

The Board did not err in considering other applicable state and local regulations when it denied the Association's substantial development permit based on deficiencies outside SEPA. The next issue is whether those other regulations established ascertainable standards by which to measure the Project.

### A. Scenic Views
### 1. Ascertainable Standards

The Association contends that SJCSMP contains no ascertainable standards for determining what is a scenic view and, therefore, insofar as it attempts to regulate aesthetics, it is void for vagueness.[30]

We addressed aesthetic values as an appropriate component of land use in *Anderson v. City of Issaquah*, 70 Wn. App. 64, 82, 851 P.2d 744 (1993), holding that they require clear guidance to the community. But environmental values are often difficult to quantify. *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 66, 578 P. 2d 1309 (1978). Nonetheless,

---

[29]Moreover, when San Juan County issued the DNS under SEPA, it was aware that the permit had to meet San Juan County's Shoreline Master Program, which adequately addressed environmental impacts.

[30]The Association cites *Portage Bay-Roanoke Park Community Council v. Shorelines Hearings Bd.*, 92 Wn.2d 1, 593 P.2d 151 (1979), in which the court upheld a substantial development permit, despite complaints about aesthetics and view obstruction, because there was no "refined master plan" that set aesthetic standards. *Portage Bay*, 92 Wn.2d at 5-6.

Washington courts have upheld shoreline master plans that describe preservation of scenic views in general terms.[31]

■ Consistent with case law, the SJCSMP identifies scenic view objectives. First, SJCSMP § 16.40.307 provides that the goal of conservation lands, such as the Property, is "[t]o assure the preservation of *scenic* and non-renewable natural resources and to assure the conservation of renewable natural resources for the benefit of existing and future generations." (Emphasis added.) Second, SJCSMP § 16.40-.307(1) (Policies) provides:

> County government should endeavor to assure the preservation, reclamation, rehabilitation, and where possible, the enhancement of unusual, fragile, and/or *scenic* elements, and of non-renewable natural resources.

(Emphasis added.) Third, "[p]reservation of scenic views and vistas should be encouraged." Section 16.40.307(4).

Fourth, in defining conservancy lands, the SJCSMP discusses the following criteria:

> The Conservancy Environment is designed for areas which are largely free of intensive development. It is the most suitable designation for shoreline areas which possess a specific resource or value which can be protected without excluding or severely restricting all other uses, and for areas where primarily non-consumptive uses of the physical and biological resources are preferred. It should be applied to those areas which would most benefit the public if their existing character is maintained, but which are also able to tolerate limited or carefully planned development or resource use. It differs from the Rural Environment in that it is intended primarily to protect and conserve something more specific than simply "open space." However, *the Conservancy Environment may be used to protect areas of high scenic value* when it is felt the Rural Environment would not provide the proper type or degree of protection. Areas to be designated Conservancy should meet one or more of the following criteria:

---

[31]*See e.g., Hunt v. Anderson*, 30 Wn. App. 437, 635 P.2d 156 (1981) (also basing denial of the permit in part upon devaluation of neighboring property), citing *Polygon*, 90 Wn.2d 59.

. . . .

> d. *areas possessing scenic or recreational qualities* of considerable local, regional, or statewide significance which would be adversely affected by extensive modification or use. . . .

SJCSMP § 16.40.405 (Designation Criteria) (emphasis added).

Finally, under section 16.40.508 (Docks and Piers), the SJCSMP discusses the interplay between scenic values and construction of docks and piers:

> Floating docks generally have less visual impact than piers.[32] [Introduction]
>
> . . . .
>
> 2. The use of floating docks should be encouraged in those areas were scenic values are high. [Section 16.40.508(2)]
>
> 3. Piers should be encouraged . . . where scenic values will not be impaired. [Section 16.40.508(3)]
>
> 4. Every application for a substantial development permit for dock or pier construction shall be evaluated on the basis of multiple considerations, including but not necessarily limited to . . . scenic views, and public access to the shoreline. [General Regulations section 16.40.508, part 5]

These SJCSMP tools for assessing the impact of piers and docks on scenic values are neither less vague[33] nor more specific than those we found adequate in *Hunt v. Anderson*, 30 Wn. App. 437, 635 P.2d 156 (1981). In *Hunt* we upheld, under the SMA, removal and replacement of a

---

[32]"A dock or pier is a platform structure extending from the shore and built to sit over and float upon the water. It is used as a landing place for commercial or pleasure craft. . . ." SJCSMP § 16.40.508 (Introduction).

[33]The cases the Association cites do not support its vagueness argument. For example, the Association cites *Anderson* 70 Wn. App. at 81, for the principle that "[t]oo broad a discretion permits determinations based upon whim, caprice, or subjective considerations." But that case concerns the design treatment of a building, characteristics that are relatively easy to specify, as compared to scenic views. *Compare Hunt*, 30 Wn. App. 442 (upholding view criteria within a shoreline master plan).

mobile home that obstructed the neighbors' view of Lake Chelan. *Hunt*, 30 Wn. App. at 442. The Chelan County master program protected scenic views, in general terms, as follows:

> The location and design of all proposed structures shall be such that *obstruction of scenic views and vistas is minimized.* This shall apply to protection of views from both public and private property.

*Hunt*, 30 Wn. App. at 440 n.3 (emphasis added).[34]

### 2. Application of Standards

The Association also argues the Board was purely subjective in finding that the dock would create an adverse scenic impact. The record indicates otherwise: (1) The Board visited the site the morning of the hearing; (2) it viewed videotapes prepared by the Association, which showed views of the Bay from Roche Harbor Road and the proposed dock site; (3) it viewed photographs of Westcott and Garrison Bays; (4) it heard a neighbor's testimony about the view from his home; and (5) it examined an illustration of the proposed dock overlaid on a poster-sized photograph of the Bay. It is undisputed that the fixed portion would protrude 230 feet in bridge-like fashion out over the Bay, five to eight feet above the Bay at high tide, and that the floating end would rest upon the mudflats at low tide. The evidence depicted how the proposed dock would appear from multiple vantage points—it would substantially obstruct natural shoreline views.

Moreover, similar to *Hunt*, the Board did not deny the dock permit solely because of its adverse impacts on scenic views. Rather, the Board also found: (1) that the Association failed to demonstrate that the no-dock status quo was

---

[34]Essential to our holding was that the mobile home also devalued neighboring property. *Hunt*, 30 Wn. App. at 440-41. Thus, denial of the permit was not based solely on obstruction of scenic views.

inadequate; and (2) that the Project was inconsistent with County goals to limit proliferation of docks.

## B. Reasonable Alternative

SJCSMP General Regulation No. 4 (16.40.508) provides in pertinent part:

Applications for non-exempt docks and piers associated with single-family residences shall not be approved until:

a. it can be shown by the applicant that existing facilities are not adequate or feasible for use;

b. alternative moorage is not adequate or feasible;

. . . .

d. the applicant shall have the burden of providing the information requested for items a, b, and c [omitted] above, and shall provide this information in a manner prescribed by the Administrator.

The Association contends: (1) The Board misinterpreted the state Shoreline Management Act and the San Juan County Shoreline Master Program; (2) General Regulation No. 4 applies only to docks for single family residences, and not to community structures, such as the proposed shared subdivision dock; (3) General Regulation No. 4 does not invite the Board's inquiry about the applicant's intended use; and (4) the Board incorrectly found that launching dinghies from shore at low tide was a reasonable alternative to the proposed 345-foot dock.

The Association failed to meet its burden of proving that its dock proposal was consistent with both the SMA and the SJCSMP. *See Buechel*, 125 Wn.2d at 205. Contrary to the Association's assertion, SJCSMP General Regulation No. 4 requires the Board to determine whether the applicant has demonstrated that existing facilities and alternative moorage are inadequate or not feasible; to make such determination, the Board must know how the dock is to be used.

Association president, Augustine, testified: (1) During low tide, most homeowners have to drag their dinghies over the mudflats to reach the water, although he borrowed his neighbor's boat with wheels; (2) from May through September there would be 16 days of minus tide when the proposed dock would not reach the water; (3) during a 6.5 high tide, he must drag his boat a short distance; and (4) at 8.0 or greater tide, he can launch his boat from the beach. Marshall Sanborn, former San Juan County permit coordinator, confirmed that at tides 6.5 or higher, Association homeowners can launch vessels from the shore.[35]

The Association homeowners, none of whom were full-time residents, testified that they wanted their children and grandchildren to have access to the Bay. Augustine testified that the families had considered mooring at nearby Roche Harbor, accessible through Mosquito Pass, which is heavily traveled, contains large boat wakes, and would be too hazardous for children.

Augustine's father-in-law, Blair Burner, testified: (1) He kept his boat in Kirkland; (2) he planned to purchase a 16-foot sailboat for use in the islands; (3) he had no intention of mooring this new boat at nearby Roche Harbor because it was "not that convenient"; and (4) he had not inquired about availability of alternative moorage.[36] Burner did not want to walk through mud at low tide to reach a boat;

---

[35]Using a 1996 tide table, Sanborn highlighted tides 6.5 and above for the period May through September. The table lists approximately 114 days during this period when the tides were above 6.5. These tides occurred primarily in the early morning and afternoon.

[36]Roche Harbor, which is less than 1.5 miles from the Association property, had readily available space for small boats. The General Manager of Roche Harbor Resort sent a letter, dated November 22, 1995, to Bob Querry, the Permit Coordinator for San Juan County Planning Department, in response to Querry's inquiry regarding available moorage at Roche Harbor:

**Current small boat moorage**

Currently, our "C" dock is approximately 300 lineal feet. This dock is used for "bow ties", small boats secured by a bow line to a single dock cleat. At the present spacing of approximately 8' per cleat, this provides adequate moorage for 37 boats at one time. The cleats spaces are not assigned to a specific boat. Many boats are out (outer islands) for weeks at a time. As a result the practical capacity is greater than 37 boats. Currently we have 21

instead, he planned to use the proposed Association dock and a mooring buoy, which he did not yet have, to reach a sailboat, which he had not yet purchased.[37]

Loren DeShon, a property owner one lot south of the Association property, testified: (1) He launches his boat from the beach at high tide with little difficulty; (2) he simply avoids launching at low tide; (3) many neighbors also launch small boats from shore; and (4) his grandchild was able to launch the boat from his property. Susan Meredith, a resident around the point on Mosquito Pass, similarly testified that she must also drag her kayak through the mudflats on her property to reach the water, which "isn't that difficult if you wear the proper shoes or boots."

## C. Cumulative Effect

The Legislature recognized the "necessity of controlling the cumulative adverse effect" of "piece-meal development

bow tie leases. Although [sic] do have a waiting list for dedicated moorage slips, there is no wait list for bow ties and we readily accept any new bow tie boats. The current rate for a bow tie is $75/month which includes an upland parking spot.

**North Island Dock Impact**

San Juan County is intending to lease 75 lineal feet of "C" dock for a North Island Dock. This uses approximately 9 bow tie lease cleats, which would leave approximately 7 open cleats available for new leases.

**Future small boat moorage**

We anticipate the bulk of our future permanent moorage demand to be larger boats, 30′ and above. Thus the proposed slips are oriented to a larger boat. However is [sic] there is demand for smaller boats, we will accommodate them by assigning a larger slip to multiple small boats (e.g. 3 - 12′ boats in a 40′ slip). Under this scenario we expect small boat moorage rates to be based on boat length with a minimum equal to our bow tie rate (currently $75/month).

[37]When asked whether he felt he needed a dock from the Association's property to sail, Burner replied:

I've tried to walk out through the mud at low tide. My white duck shoes will come off, I've left them in the mud and I've had my boots come off. It's not just mud, it's like glue out there. I can't imagine dressing in white boat shoes and a pair of slacks and have my wife do the same thing and the two of us, especially my wife, drag a small dingy out to the point where we could launch it and row out to a sailboat.

of the state's shorelines" through "coordinated planning" of all development, not only "substantial development." *Hayes v. Yount*, 87 Wn.2d 280, 288, 552 P.2d 1038 (1976) (citing RCW 90.58.020). Here, the Board found that

> [e]ven if the proposed dock would not in and of itself constitute major intrusion on the shoreline, the prospect of other property owners on Westcott Bay or similarly situated embayments within San Juan County attempting to build bridges across mud flats is untenable.

*See Buechel*, 125 Wn.2d at 210 (reasonable for Board to consider cumulative effects of allowing structures to be built on the shoreline with no setback from the high water line).

### IV. STANDARD OF REVIEW

██ ██ The Administrative Procedure Act (APA), RCW 34.05.570(3), governs our review of the Board's decision. *Lund v. Department of Ecology*, 93 Wn. App. 329, 333, 969 P.2d 1072 (1998) (citing *Batchelder v. City of Seattle*, 77 Wn. App. 154, 158, 890 P.2d 25, *review denied*, 127 Wn.2d 1022 (1995)); *Buechel*, 125 Wn.2d at 201. "[W]e review the Board's record and decision, not that of the superior court." *Lund*, 93 Wn. App. at 333 (citing *Jefferson County v. Seattle Yacht Club*, 73 Wn. App. 576, 588, 870 P.2d 987 (1994)).

██ We will not reverse the Board's decision unless (1) it is clearly erroneous in light of the record and the public policies of the SMA; and (2) we are firmly convinced that the Board erred in light of the policies of the SMA. *Buechel*, 125 Wn.2d at 202.

### A. Interpretation of the Law

██ Interpretation of the SMA and the SJCSMP involves questions of law, which we review for errors of law. *Lund*, 93 Wn. App. at 333 (citing *Jefferson County*, 73 Wn. App. at 589). We give substantial weight to an agency's interpretation of law within its area of expertise. *Lund*, 93

Wn. App. at 333 (citing *Jefferson County*, 73 Wn. App. at 588). Although we may substitute our interpretation of the law for that of the agency,[38] we will not reverse the Board's decision unless the Board "has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure; . . . [or] [t]he agency has erroneously interpreted or applied the law." *Batchelder*, 77 Wn. App. at 158 (citing RCW 34.05.570(3)(c), (d)). Such is not the case here.

## B. Arbitrary and Capricious

■■■ We may overturn the Board's decision if it is arbitrary or capricious, or when "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court. . . ." *Batchelder*, 77 Wn. App. at 158, (citing RCW 34.05.570(3)(e), (i)). "A Board's decision is arbitrary or capricious if it is 'willful and unreasoning action in disregard of facts and circumstances.' " *Buechel*, 125 Wn.2d at 202 (citing *Skagit County v. Department of Ecology*, 93 Wn.2d 742, 749, 613 P.2d 115 (1980)).

> Where there is room for two opinions, action is not arbitrary and capricious when exercised honestly and upon due consideration though it may be felt that a different conclusion might have been reached.

*Buechel*, 125 Wn.2d at 202 (citations omitted).

Applying these standards, we hold that the SJCSMP provided adequate guidelines for scenic views, an environmental standard that we acknowledge is difficult to quantify. The record supports the decision of the Board, which relied on its expertise to resolve the legal issues.

The Board's findings uphold San Juan County Shoreline Master Program policies restricting shoreline uses to those "compatible with the natural and biological limitations of

---

[38]*Overlake*, 90 Wn. App. at 754 (citing *Haley v. Medical Disciplinary Bd.*, 117 Wn.2d 720, 728, 818 P.2d 1062 (1991)).

the land and water. . . ." The Board looked to its past San Juan Island cases to underscore that a "property owner's desire for a dock must be balanced against the natural limitations of the subject shoreline."[39] The record also supports the Board's findings concerning the probable[40] negative impact of additional docks on Westcott Bay.[41] The Board did not err as a matter of law in finding that the dock was inconsistent with the SJCSMP.[42]

---

[39]For example, in *Anderson v. San Juan County*, SHB No. 94-13, the Board denied a much shorter, 100-foot dock that would have extended over tidelands.

[40]WAC 197-11-782.

[41]There was substantial evidence regarding the uniqueness of Wescott Bay:

1. Ex. A-12, Letter from Department of Fish and Wildlife re: eelgrass

2. Ex. A-22, Tideland study and map

3. Ex. A-23 & 24, Videotapes showing Westcott and Griffin Bays.

4. Ex. A-25, Photographs of Westcott and Griffin Bays

5. Ex. I-1, Excerpts from the Coastal Zone Atlas

6. Ex. I-4, Overlay of dock onto poster size photograph of Westcott Bay

7. Ex. I-14, Photographs of site by Loren DeShon

8. Ex. R-7, San Juan County Planning Department Staff Report re: this project. This is the complete report that contains information about herring spawning in Westcott Bay, citizen comments, information from Snug and Roche Harbors, re: moorage availability, eelgrass studies, aerial views of Westcott Bays, drawings of the proposed dock, and tide tables.

9. Ex. R-7(15), Amended staff report

10. RP 113-168, Testimony of Bob Querry, San Juan County Planning Department

11. RP 188-189, Loren DeShon, Westcott Bay Resident, flora and fauna

12. RP 196-198, Susan Meredith, historical changes of Westcott Bay

13. RP 206-30, Dr. Richard Strathmann, Associate Director of the Friday Harbor Labs, University of Washington. Biological diversity of Westcott Bay.

[42]The Association argues that the Board failed to apply the pertinent policies and regulations of the SMA or the SJCSMP, which policies the Association also contests. Nonetheless, the SMA states in pertinent part:

[L]ocal government, in developing master programs for shorelines of statewide significance, shall give preference to uses in the following order of preference which:

(1) Recognize and protect the state-wide interest over local interest;

The Board found that although the dock was called "dinghy dock," it would not be used "to accommodate tenders for deeper draft vessels moored offshore on a seasonal or long term basis" because that part of Westcott Bay is shallow and nearby was Roche Harbor, which could moor larger vessels. The Board also found that the marginal improvement to the homeowners' ease in launching small boats during low tides, facilitating day sailors, and access to the Bay for their children and grandchildren, did not rise to the level of necessity required by the SJCSMP. The proposed dock's marginal increase in convenience also did not outweigh the proposed dock's obstruction of public waters and tidelands, and private and public scenic views. Reviewed in light of the record and applicable law, the Board's finding—that the existing boat launching access was adequate and feasible—was not arbitrary or capricious.

## V. ATTORNEY FEES

As the prevailing party below and on appeal, Friends of the San Juans and Westcott Bay Seafood Farms request costs and attorney fees under RAP 14.2, RAP 18.1, and RCW 4.84.370. RCW 4.84.370 allows attorney fees and costs to the prevailing parties if they prevailed in all prior judicial

---

(2) Preserve the natural character of the shoreline;

(3) Result in long term over short term benefit;

(4) Protect the resources and ecology of the shoreline;  ·

(5) Increase public access to publicly owned areas of the shorelines;

(6) Increase recreational opportunities for the public in the shoreline;

(7) Provide for any other element as defined in RCW 90.58.100 deemed appropriate or necessary.

In the implementation of this policy the public's opportunity to enjoy the physical and aesthetic qualities of natural shorelines of the state shall be preserved to the greatest extent feasible consistent with the overall best interest of the state and the people generally. . . . Alterations of the natural condition of the shorelines . . . in those limited instances when authorized, shall be given priority for single family residences and their appurtenant structures . . . .

RCW 90.58.020.

proceedings, as is the case here. Accordingly, we award Friends of the San Juans and Westcott Bay Seafood Farms attorney fees upon compliance with RAP 18.1.

We hold that the Board properly denied the Association's request for a permit to build the dock; thus, we affirm.

ARMSTRONG, A.C.J., and SEINFELD, J., concur.

Review denied at 142 Wn.2d 1014 (2000).