FILED
COURT OF APPEALS
DIVISION II

2013 MAR 19 AM 8: 40

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DAVID AMBAUEN and JANA AMBAUEN, husband and wife, | No. 41921-1-II |
| Respondents, | UNPUBLISHED OPINION |
| v. | |
| COLIN YOUNG, a single man, | |
| Appellant. | |

BRIDGEWATER, J.P.T.[1] — Colin Young appeals the trial court's award of attorney

fees and costs relating to David and Jana Ambauen's summary judgment proceedings

against him and from numerous trial court rulings during a trial on his counterclaims

against the Ambauens. We hold: (1) Young failed to preserve or sufficiently brief his

challenges to the summary judgment attorney fees award; (2) Young did not have a

standing objection to evidence of the Ambauens' lawsuit against Young during trial on

his counterclaims against them and, thus, failed to preserve for appeal his challenge to

that evidence; (3) the trial court properly refused to give Young's proposed jury

instructions: numbers 15, 18, 19, and 20; (4) the trial court did not abuse its discretion in

---

[1] Judge C. C. Bridgwater is serving as a judge pro tempore of the Court of Appeals, Division II, pursuant to CAR 21(c).

excluding one of Young's proposed expert witnesses from giving cumulative testimony; and (5) the trial court did not abuse its discretion in limiting Young's cumulative cross-examination of the Ambauens' expert witness. We affirm the jury verdict for the Ambauens and grant them attorney fees and costs, and we deny Young's request for attorney fees and costs on appeal.

## FACTS

The Ambauens owned property adjacent to that of Young's mother, Lorna Young. In 2000, Colin Young purchased his property from Lorna. This case arises from a dispute between these former neighbors.

### I. PROCEDURAL FACTS

In March 2004, the Ambauens filed a complaint alleging that Young was using part of his property as a "motor vehicle junkyard," which constituted a private nuisance and violation of local ordinances, and were seeking damages and removal of the vehicles. Clerk's Papers (CP) at 3-6. Young's answer raised counterclaims generally based on David's[2] alleged acts on Young's property: destruction of vegetation; filling of wetlands; construction of a bridge to an island straddling their property lines; piling "yard waste"; and limbing trees. CP at 17-19.

In July 2005, the Ambauens moved for summary judgment on their claims against Young. In August 2005, the trial court granted summary judgment in the Ambauens' favor, ordering Young "to remove all vehicles in excess of those allowed to be stored." CP at 147-48.

_____

[2] When necessary for clarity, we refer individually to David and Jana Ambauen by their first names, meaning no disrespect.

In May 2007, the Ambauens moved for an award of attorney fees and costs associated with the summary judgment motion. In June 2007, the trial court entered a judgment awarding the Ambauens $14,819.50 in attorney fees and costs.

In November 2007, the Ambauens filed a statement of arbitrability stating that Young's counterclaims against them were not in excess of $50,000. On July 17, 2008, an arbitrator entered an award in the Ambauens' favor. On August 5, Young requested a trial de novo.

At trial, the court denied Young's proposed jury instructions on timber trespass and statutory trespass. Instead, it instructed the jury on common law intentional trespass. The jury returned a verdict for the Ambauens. On February 17, 2011, the trial court entered a judgment awarding the Ambauens their attorney fees and costs at trial. Young appeals.

## II. SUBSTANTIVE FACTS

### A. The Pond and Island

At trial, Young's claims centered primarily on a man-made pond with an island at its center and the land surrounding the pond. The pond and island, constructed in the early 1970s under a permit from the United States Department of Agriculture's Soil Conservation Service, was subsequently divided by property lines: the northern portions of the pond and island were on Young's property, while the southern portions were on the Ambauens' property.[3] Both a 1990 survey commissioned by the Ambauens and the "U.S. Fish and Wildlife Service National Wetlands Inventory, Online Mapper" identified the land surrounding the pond as wetlands.

---

[3] The parties disputed how much of the island they each owned. Young believed he owned "just less than half" of the island. Report of Proceedings (RP) at 245. David believed he owned 90 percent of the island.

3

According to Young, the land surrounding the pond was "heavily covered" with salmonberry bushes so thick that "you would have to fight your way through them." RP at 219, 236. Young had observed David mowing the Ambauens' property around the pond in the past.

Young testified that, in 1998, he saw David driving a backhoe[4] on the Ambauens' property. David told him that he was having drainage problems on his property and asked for permission to enter Young's property and "dig out" a nearby creek "where it was necessary." RP at 229-30. Young told him no. In 2002, Young discovered tread marks near the creek on his property leading back to the Ambauens' property. Between six and nine months later, Young observed David on Young's property with the backhoe; Young confronted David, told him to get off his property, and said he never wanted to see David on his property again with the backhoe. A few days later, he again observed David on his property "down in the creek bed" with the backhoe; David drove away when Young began approaching him. RP at 233-34.

In 2003, Young noticed what he perceived as survey tape on trees in the pond's vicinity. In spring 2004, Young discovered that the salmonberry bushes, in a 200-foot by 25-foot area north of the pond, had been "completely obliterated." RP at 235, 279. Sand, straw, and "some spring grasses" covered the area. RP at 236. Young dug at least six test holes in the area with similar results; the holes contained "mucky-looking clay-covered wood" and "branches and such." RP at 239-40. The "original soils" and green "swamp grass" were at the bottom of the

---

[4] Young subsequently refers to the backhoe as a tractor. But other witnesses, including David, described the machine as a backhoe.

holes, while "clay and sand soils" were on top of them. RP at 239. The fill material consisted of "a couple of dump truck loads" and was between 21 and 24 inches deep at its deepest area. RP at 249, 264.

Any place that had been filled in this manner had been covered with straw. Young observed some tractor tread marks in the filled area and, after kicking the straw aside, he observed "where the back blade of a backhoe had been [dragged] to smooth the area out." RP at 237. After examining the fill material and observing that it was "consistent with what one would find in and around the pond," Young concluded that David had excavated the pond and spread the fill material around the area. RP at 264-65.

Thomas Bradley was with Young during David's latter two alleged intrusions onto Young's land with a backhoe, as well as when Young examined the filled area, and he testified consistently with Young's account. He also testified that there were survey markers near the filled area that "indicated a property line as far as [he knew]." RP at 125.

David confirmed at trial his affirmative response to Young's pretrial request for admission that he had personal knowledge of the property lines from the 1990 survey. But David also testified that the 1990 survey was the only official survey of the property conducted. Additionally, in 2002 or 2003, he and Jana placed the survey markers in an attempt to find the Ambauens' northwest property corner. But their ultimate purpose was to locate the corner and establish "clear viewpoints through the trees" to measure distance, not to mark the property line, and some of the markers were sight markers, not measurement markers. RP at 392-93, 399. And the Ambauens used their memory of the property lines, not the 1990 survey, in placing the

5

markers. According to David, the alleged incidents where Young confronted him about having the backhoe on Young's property never happened.

David also testified that, after showing the employee where to mow, he had an employee mow around the pond with a brush hog. But David said he never "cut salmonberry back" on Young's property side, and he did not recall any salmonberry around "the neck of the pond." RP at 427, 447.

According to David, when he first met Young in 1992 or 1993, Young "agreed that it was in [their best] interest for [David] to be cleaning out the creek, and [David] assumed that it was equally beneficial for maintenance of the pond." RP at 424-25. David's understanding from the conversation was that

> [Young] had given [him] . . . authorization to clean out the creek that day while [Young was] there, and then . . . it was a general agreement that [they] had as adjacent property owners that that was acceptable, mutually beneficial work that [David] was doing for [Young's] benefit.

RP at 433. Thus, in October 2003, David used his backhoe at "the very northern-most tip" of the pond to pull out debris. RP at 418-19. The debris was "kind of a slurry . . . because it's decomposed sticks and grass clumps and leaves." RP at 419. David used the backhoe's back blade to "spread [the debris] around evenly" on the surrounding land and covered the back-bladed areas with hay "to protect from erosion and try to get [the areas] to reseed as quickly as possible." RP at 419-20.

B.    Expert Testimony

Robert Rodman, an environmental engineer, testified as Young's expert witness. Rodman performed onsite inspections around the pond's north end and observed around the pond's edges a 20- to 25-foot-wide strip of land where nothing grew but "a little bit of grass."

RP at 296-97. According to Rodman, this was not naturally occurring because wetland plants, like salmonberry bushes, "like to grow right on the water." RP at 302. Rodman also dug test holes, observed "lots of plant materials" and wetland soils at their bottoms, and concluded someone had filled in the wetlands along the pond's edges. RP at 298.

Rodman also observed reed canary grass, a "very aggressive" and "invasive species" of plant that was "hazardous to the . . . aquatic ecosystem" around the pond. RP at 303, 312. According to him, shade provided by salmonberry bushes prevented grasses from growing. Rodman concluded that the canary grass had "expanded quite a bit" after the area was filled in. RP at 312. Rodman estimated that it would cost between $48,600 and $55,000 to restore the filled wetland areas. His estimate included $20,000 for a Washington State Environmental Policy Act impact assessment, Kitsap County grading permit, and "Joint Aquatic Resources" permit, which he opined were necessary for the restoration work; $8,000 for removal of 556 yards of fill soils; $11,000 for replacing wetland soils; $8,000 for wetland vegetation restoration, including 200 salmonberry bushes he opined were needed; and $3,600 for a three-year maintenance period of weeding out canary grass as it reappeared.

Finally, Rodman also reviewed the report of Marc Boule, a wetlands researcher and consultant who examined the site and who is the Ambauens' expert witness, and took issue with Boule's opinion that the filled areas were already recovering on their own and that removal of the canary grass was unnecessary for the area's restoration. According to Rodman, any new wetland vegetation would be prevented from taking root and "crowded out" by the canary grass, necessitating its removal. RP at 331-32.

7

According to Boule, there are "often[]times" distinct boundaries between wetland plant species, such as between the grass and salmonberry bushes around the pond. RP at 451, 460, 497. Boule could not say that the lack of salmonberry bushes in the filled areas resulted from a "disturbance" that "removed" them. RP at 497. Moreover, salmonberry did not necessarily prevent the spread of the canary grass; in fact, canary grass was capable of overcrowding, outshading, and killing salmonberry.

Boule also testified that his site examination demonstrated the filled area's dimensions were only 20-by-20 foot. The canary grass was "probably" present and "an important part of the understory" before David filled the area. RP at 458. David's filling of the area actually removed some of the canary grass by crushing and burying it, which in turn would assist native, competing plant species in reestablishing themselves there. Boule opined that no restoration work was necessary due to David's filling activities; the surrounding tree canopy shade would slow the canary grass's expansion; and, "if everything was just left alone, the native species would eventually overcome the canary grass." RP at 460, 517, 519.

Finally, Boule testified that preparing a formal wetlands delineation was a necessary first step in determining whether permitting agencies would require permits for work on the site, and no delineation of the site had been performed. He also stated that Young did not necessarily require permits for Rodman's proposed restoration project; the permitting agencies might review a project of such limited scope and issue "a letter of permission" or say they were "not really interested," instead of requiring "a full-blown permitting process." RP at 501-02. Boule had contacted "a number of . . . resource agencies who might have jurisdiction" over Rodman's proposed project and who said the project was "too small"; was "marginally out of [their]

jurisdiction"; and, "as long as there's no structure being constructed and as long as there's no adverse impact on endangered species, [the agencies did not have] time for something like [the project]." RP at 502.

C.    Young's Other Claims

Young testified that in 1999, he became aware someone had constructed a bridge to the pond's island. After he saw the Ambauens' survey markers in 2003, he realized that between 85 and 90 percent of the bridge was on his property, and the bridge's removal would cost $300. At some point, he also discovered that someone had cut hay without permission on another part of his property. He "[had] been doing hay for years" and estimated that 20 bales of hay had been cut at a price between $5 and $7 dollars per bale. RP 222-23. In 2002, he discovered a pile of "yard waste" and "lawn clippings" on another part of his property; removal would cost between $300 and $400. RP at 226-27. Further, while discovering the filled areas in 2004, Young noticed that someone had cut off limbs from an unspecified number of trees on his property, and there was a "huge pile of branches" on his portion of the island. RP at 244-46. Finally, after discovering the filled in areas, Young purchased seven or eight steel fence posts and a roll of "sheep fencing" and left them on his property, intending to erect a fence; when he returned three weeks later, the fencing materials had disappeared. RP at 253. He estimated the replacement cost was between $150 and $160.

According to David, the bridge was entirely on the Ambauens' property. He cut hay on his own property for sale, not on Young's property. He did not recall himself or his employees dumping lawn clippings or yard waste on Young's property, and he believed the yard waste Young photographed was debris from some other neighbors' barn demolition. David never

9

personally cut nor directed his employees to cut limbs off trees on Young's property. Although David admitted the pile of branches was on Young's portion of the island, he stated that tree branches would fall into the pond and onto the island, one of his employees would gather the branches and pile them where they were found, and the branch pile looked like something the employee would have done. Finally, David denied taking the fencing materials.

## ANALYSIS

### I. ATTORNEY FEES RELATED TO SUMMARY JUDGMENT

Young argues that the trial court erred in awarding attorney fees and costs to the Ambauens for their summary judgment motion against him because: (1) the Ambauens failed to comply with CR 54(d)(2)'s 10-day time limit for moving for attorney fees; (2) they were not prevailing parties in the action; (3) they lost standing in their action; (4) they improperly included certain items in their cost bill; and (5) the trial court awarded fees without making "well reasoned and written findings." Br. of Appellant at 14-23. We need not address these claims as explained below.

First, Young raises his CR 54(d)(2) argument for the first time on appeal. RAP 2.5(a) generally does not allow parties to raise claims for the first time on appeal unless the claims constitute manifest error affecting a constitutional right. Young devotes one conclusory sentence of his briefing to argue his claim constitutes manifest constitutional error. But this court does not consider conclusory arguments. *See* RAP 10.3(a)(6), .4. "Such '[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012) (quoting *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998)). Moreover, Young fails to support his argument with

citations to the record. We do not address arguments unsupported by citations to the record. *See* RAP 10.3(a)(6); *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970, *abrogated in part on other grounds*, *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Accordingly, we do not address this claim.

Young also fails to support his prevailing party, standing, and cost bill itemization arguments with citations to the record or to authority. And he fails to support his argument that the trial court failed to make sufficient, written findings with citation to authority. We do not consider claims unsupported by argument or citation to legal authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

## II. ADMISSION OF EVIDENCE OF PRIOR LAWSUIT

At trial, the Ambauens elicited Young's testimony that, after they sued him, he wrote to other neighbors and stated, "I am writing to you to determine the extent to which a civil conspiracy has taken place. You may wish to seek the advice of an attorney if you are involved." RP at 276-77. The Ambauens also elicited David's testimony that, after they sued Young, Young told him, "Well, you have got a monster lawsuit on your hands, and you are going to regret ever having messed with me." RP at 532-33.

The Ambauens also elicited Young's testimony that he had stored "collector cars" on his property. RP at 272. Over Young's objection, the trial court admitted exhibit 5, a photograph of the cars on Young's property, for impeachment purposes. The trial court admitted exhibit 10, an aerial view of the cars on Young's property, as an illustrative exhibit. At the trial's conclusion, Young stipulated to exhibit 10's admission as substantive evidence, along with exhibits 23 and 24, diagrams of his and the Ambauens' property that he had made.

11

Young now argues that the trial court abused its discretion because admission of evidence of the Ambauens' lawsuit against him violated ER 403 and 404(b). The Ambauens respond that Young waived his challenges to much of this evidence because he failed to object to its admission at trial. Young replies that his motion in limine served as a standing objection to such evidence, and further objections were unnecessary to preserve his claims for review. We disagree with Young that he had a standing objection to the evidence. Thus, because Young failed to renew his objection to the evidence at trial, we hold that he failed to preserve this issue for review.

Before trial, Young moved in limine to exclude "any evidence or testimony relating to the . . . storage of cars or [Young's] use of the subject property for automotive activities, as previously addressed in the [Ambauens'] now concluded claims." CP at 360, 362. His motion argued, "All testimony, documents, and photographs relating to [the Ambauens'] completed claims or showing, describing, or relating to the storage of vehicles are inadmissible under ER 403 and ER 404(b)." CP at 361.

In the Ambauens' response, they argued that such evidence was relevant to show that Young's counterclaims against them arose out of spite for their lawsuit against him. At the hearing on Young's motion, when asked to elaborate on how "spite" was relevant to the case, the Ambauens argued that it showed Young's "motive" and "bias." RP at 29. The trial court denied Young's motion and stated:

> [The Ambauens] are limited to very brief inquiry as to timing of the suit and the context that leads us here today . . . . and that would be subject to objections by you if you think it's going beyond just a context argument.

RP at 31. Young later asked the trial court to clarify its ruling:

12

THE COURT: I stated that the defense can go into questions about the prior litigation for providing a context for how this is coming up now, and go into the timing of how the lawsuits have proceeded, and they are claiming that there's a motive here, because you were sued, you are countersuing, and that's going to be obvious to the jury. They are going to know there's a counterclaim.

. . . .

MR. YOUNG: [H]ow would I raise the issue with the court if they seem to be exceeding the mandate that you have given them?

. . . .

THE COURT: You say, "Object. It's covered in the motions in limine."

RP at 54-55.

When evidentiary decisions are made pursuant to motions in limine, the losing party is deemed to have a standing objection where the trial court has made a final ruling on the motions. *State v. Powell*, 126 Wn.2d 244, 256, 893 P.2d 615 (1995). If, however, the trial court makes a tentative ruling or indicates that a further objection at trial is required, "'the parties are under a duty to raise the issue at the appropriate time with proper objections at trial.'" *Powell*, 126 Wn.2d at 256 (quoting *State v. Koloske*, 100 Wn.2d 889, 896, 676 P.2d 456 (1984), *overruled on other grounds by State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013 (1989)).

Here, through his motion in limine, Young objected to the admission of evidence of the Ambauens' lawsuit against him. The trial court denied Young's motion in limine and stated the challenged evidence was admissible to show the context out of which Young's possible motive for suing the Ambauens arose. But the trial court also conditioned the admission of such evidence on the Ambauens' compliance with its ruling and any further objections by Young. Accordingly, the trial court's ruling was tentative and required further objections by Young, and he did not have a standing objection to admission of evidence of the Ambauens' lawsuit against

13

him. Because Young did not further object to the evidence at trial, he did not preserve his claim for appellate review.[5]

## III. JURY INSTRUCTIONS

Young argues that the trial court erred in refusing to give his proposed jury instructions 11, 15, 16, 18, 19, 20, 23, and 24 and in giving the trial court's jury instruction 8. We hold that Young failed to preserve for appeal his challenges to the trial court's instruction 8 and its refusal to give his proposed instructions 11, 16, 23, and 24. Further, we hold that the trial court did not err in refusing to give his proposed instruction 15, 18, 19, and 20.

### A.      Standard of Review

"A trial court's decision to give a jury instruction is reviewed de novo if based upon a matter of law, or for abuse of discretion if based upon a matter of fact." *Kappelman v. Lutz*, 167 Wn.2d 1, 6, 217 P.3d 286 (2009). "Jury instructions are sufficient when they allow counsel to argue their theories of the case, do not mislead the jury, and when taken as a whole, properly inform the jury of the law to be applied." *Thompson v. King Feed & Nutrition Serv., Inc.*, 153 Wn.2d 447, 453, 105 P.3d 378 (2005).

"[A]n instruction that contains an erroneous statement of the applicable law is reversible error where it prejudices a party." *Thompson,* 153 Wn.2d at 453. But the court has no duty to give an incorrect instruction. *Griffin v. West RS, Inc.*, 143 Wn.2d 81, 90, 18 P.3d 558 (2001). A party is generally entitled to a requested instruction only when substantial evidence supports the

---

[5] Moreover, Young ultimately stipulated to exhibit 10's admission as substantive, not merely illustrative, evidence. Accordingly, even if we reached the merits of Young's claim, any error from exhibit 10's admission was invited by Young. *See City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002) (the invited error doctrine prohibits a party from setting up an error at trial and then complaining of it on appeal).

14

instruction. *Delahunty v. Cahoon*, 66 Wn. App. 829, 837, 832 P.2d 1378 (1992). "Evidence is substantial if it would convince an unprejudiced, thinking mind of the truth of the declared premise." *Jefferson County v. Seattle Yacht Club*, 73 Wn. App. 576, 588, 870 P.2d 987 (1994).

B.    Preservation

Young based his proposed instruction 19 on RCW 64.12.030,[6] the timber trespass statute, and his proposed instruction 20 on RCW 4.24.630,[7] the statutory trespass statute. After reviewing the trial court's proposed instructions, he objected to excluding his instructions on

---

[6] RCW 64.12.030 provides:
> Whenever any person shall cut down, girdle, or otherwise injure, or carry off any tree, including a Christmas tree as defined in RCW 76.48.020, timber, or shrub on the land of another person, or on the street or highway in front of any person's house, city or town lot, or cultivated grounds, or on the commons or public grounds of any city or town, or on the street or highway in front thereof, without lawful authority, in an action by the person, city, or town against the person committing the trespasses or any of them, any judgment for the plaintiff shall be for treble the amount of damages claimed or assessed.

[7] RCW 4.24.630 provides:
> (1) Every person who goes onto the land of another and who removes timber, crops, minerals, or other similar valuable property from the land, or wrongfully causes waste or injury to the land, or wrongfully injures personal property or improvements to real estate on the land, is liable to the injured party for treble the amount of the damages caused by the removal, waste, or injury. For purposes of this section, a person acts "wrongfully" if the person intentionally and unreasonably commits the act or acts while knowing, or having reason to know, that he or she lacks authorization to so act. Damages recoverable under this section include, but are not limited to, damages for the market value of the property removed or injured, and for injury to the land, including the costs of restoration. In addition, the person is liable for reimbursing the injured party for the party's reasonable costs, including but not limited to investigative costs and reasonable attorneys' fees and other litigation-related costs.
> (2) This section does not apply in any case where liability for damages is provided under RCW 64.12.030, RCW 79.01.756, .760, and .070 or where there is immunity from liability under RCW 64.12.035.

"those two statutes and the supporting jury instructions that [he] had associated."[8] RP at 551.

He argued that the trial court's instruction 8,[9] the common law trespass instruction, subjected him to a different "burden of proof" in establishing damages. RP at 554-55. He also specifically objected to the trial court's refusal to give his proposed instructions 15 and 18. He failed to specifically object to the trial court's refusal to give any of his other proposed instructions.

Failure to object to jury instructions waives the issue on appeal. *Ryder v. Kelly-Springfield Tire Co.*, 91 Wn.2d 111, 114, 587 P.2d 160 (1978). And CR 51(f), which governs objections to jury instructions, requires that the objecting party "state distinctly the matter to which he objects and the grounds of his objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made."

Here, Young's specific objections to the trial court's refusal to give his proposed instructions 15, 18, 19, and 20 preserved those issues for our review. But he failed to object to the trial court's instruction 8 and his nonspecific, blanket objection to the trial court's refusal to

---

[8] The trial court repeatedly referred to Young's proposed instruction 21 when discussing his objections. But the context and content of his objections clearly demonstrated they referred to his proposed instruction 20, and neither party disputes that he objected to the trial court's failure to give that proposed instruction.

[9] The trial court referred to its trespass instruction as "number 7," but the version received by the jury was numbered as instruction 8. RP at 554; CP at 640. Instruction 8 provided:
    Washington law defines a trespass as occurring when a person:
        (a) intentionally invades property in another's exclusive possession;
        (b) it is reasonably foreseeable that the act would disturb the other's possessory interest; and
        (c) the act causes actual and substantial damage.
CP at 640. This jury instruction mirrored the elements of the common law tort of intentional trespass. *See Grundy v. Brack Family Trust*, 151 Wn. App. 557, 567, 213 P.3d 619 (2009).

16

give all his other "supporting" instructions was insufficient; thus, he has waived review of them.[10]

C.    Proposed Instruction 15

Young's proposed instruction 15 consisted of a four-page document detailing what appears to be the elements of negligence; each of his intentional trespass claims and the evidence supporting each element of each claim; and the damages the jury should award Young for each claim if it found in his favor. The trial court refused to give this instruction, ruling that it was a comment on the evidence.

We may affirm the trial court on any ground supported by the record. *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989). Here, even assuming without deciding that proposed instruction 15 accurately stated the law, its lengthy, rambling nature was likely to confuse and mislead the jury. Moreover, the instruction was unnecessary for Young to argue his theory of the case; any trespass instructions given would have allowed Young to argue in closing how the evidence supported the elements of his claims. Accordingly, the trial court did not abuse its discretion in refusing to give Young's proposed instruction 15.

D.    Proposed Instruction 18

Young's proposed instruction 18 provided:

(Waste by Trespasser)
Any waste or object placed on the land of another without authorization of the land owner constitutes a trespass, and remains a continuing trespass for as long as the trespass object or waste remains on the land. On the event of transfer of

---

[10] Young provides conclusory arguments that the trial court's refusal to give his proposed instructions was manifest constitutional error reviewable for the first time on appeal. But such conclusory arguments and passing treatment of the issue are not sufficient to merit appellate review. *West*, 168 Wn. App. at 187.

ownership of a land where any continuing trespass is occurring, the right to legal action on continuing trespass is transferred to the new land possessor.

CP at 601 (boldface omitted). The trial court refused to give this instruction, ruling that it was not supported by the evidence and that it incorrectly stated the law on waste.

Young argues for the first time in his reply brief that this instruction was necessary to allow him to address a "statute of limitations" issue with some of his claims. Reply Br. of Appellant at 33-34. But this court does not consider arguments raised for the first time in a reply brief. *Cowiche Canyon Conservancy*, 118 Wn.2d at 809. Therefore, we do not address the issue.

Even if we did consider the issue, this court may affirm on any grounds supported by the record. *LaMon*, 112 Wn.2d at 200-01. The trial court's jury instructions presented no statute of limitations question to the jury. Thus, Young's proposed instruction 18 was unnecessary for him to argue his theory of the case, as no statute of limitations was at issue. The trial court did not err in refusing to give this instruction.

E.    Proposed Instruction 19

Young's proposed instruction 19 provided:

(Timber Trespass and Ornamental Damages)
A Washington State statute provides:
. . . .
Whenever any person shall cut down, girdle, or otherwise injure, or carry off any tree, timber, or shrub on the land of another person, or on the street or highway in front of any person's house, village, town or city lot, or cultivated grounds, or on the commons or public grounds of any village, town or city, or on the street or highway in front thereof, without lawful authority, in an action by such person, village, town or city against the person committing such trespasses or any of them, if judgment be given for the plaintiff, it shall be given for treble the amount of damages claimed or assessed therefor, as the case may be.

*As to the damage to ornamental trees and shrubbery: the proper measure of damages for the wrongful destruction of ornamental trees and shrubbery which*

> *did not decrease the value of the land is the intrinsic value of the trees and shrubbery removed.*[11]

CP at 602 (boldface omitted) (emphasis added). Young argued that the evidence supporting this instruction consisted of the destruction of the salmonberry bushes and the limbing of his trees. But Young admitted that he had no method of assessing damages to the trees other than replacement costs for the entire tree and that he would "abandon the pleadings associated with the limbs." RP at 550; RP (Jan. 11, 2011) at 16. The trial court also ruled that the evidence did not support giving this instruction because, although Rodman recommended planting 200 salmonberry bushes as part of a restoration project, Young presented no evidence as to how many salmonberry bushes originally existed, how many were destroyed, or what method could be used to assess the damage to them.

We agree with the trial court's reasoning. Young ultimately stated that he had abandoned his claims regarding his limbed trees and, moreover, he presented no evidence of the amount of damages to them. Further, he presented no evidence of how many salmonberry bushes were destroyed or any method for assessing the damage to them. Thus, substantial evidence did not support giving Young's proposed instruction 19, and the trial court did not abuse its discretion in refusing to give it.

---

[11] The standard measure of damages under RCW 64.12.030 for the loss of ornamental trees or shrubbery is either restoration and replacement costs or diminution in the value of the affected property. *Happy Bunch, LLC v. Grandview N., LLC*, 142 Wn. App. 81, 91 n.3, 173 P.3d 959 (2007); *Allyn v. Boe*, 87 Wn. App. 722, 732-33, 943 P.2d 364 (1997); *Sherrell v. Selfors*, 73 Wn. App. 596, 602-03, 871 P.2d 168 (1994). The emphasized language in proposed instruction 19—that the measure of damages is the "intrinsic" value of the ornamental trees or shrubbery—inaccurately or at least misleadingly state Washington law. This is an alternative basis for holding that the trial court, as a matter of law, did not err in refusing to give the instruction.

F.    Proposed Instruction 20

Young based his proposed instruction 20 on RCW 4.24.630, the statutory trespass statute.

His proposed instruction 20 provided:

(Waste to the Land of Another)
A Washington State statute provides:

. . . .

Every person who goes onto the land of another and who removes timber, crops, minerals, or other similar valuable property from the land, or wrongfully causes waste or injury to the land, or wrongfully injures personal property or improvements to real estate on the land, is liable to the injured party for treble the amount of the damages caused by the removal, waste, or injury.

For purposes of this section, a person acts "wrongfully" if the person intentionally and unreasonably commits the act or acts while knowing, or having reason to know, that he or she lacks authorization to so act.

Damages recoverable under this section include, but are not limited to, damages for the market value of the property removed or injured, and for injury to the land, including the costs of restoration. In addition, the person is liable for reimbursing the injured party for the party's reasonable costs, including but not limited to investigative costs and reasonable attorneys' fees and other litigation-related costs.

CP at 604. The trial court refused to give this instruction because the evidence did not support it and because the trial court's instruction 8 on common law intentional trespass allowed Young to argue the various trespasses David allegedly committed.

We may affirm the trial court on any ground supported by the record. *LaMon*, 112 Wn.2d at 200-01. In *McLeod v. Ellis*, 2 Wash. 117, 122-23, 26 P. 76 (1891), our Supreme Court held that the trial court errs if it instructs the jury on an award of treble damages:

The judgment must be reversed, however, for the court charged the jury erroneously in two respects. In the *first* place, the jury were told that this was a case wherein treble damages could be awarded under section 602, unless the taking was casual or involuntary, etc.; and, *secondly*, that the jury could themselves assess the treble damages. Neither of these instructions was correct. We have already shown why the main charge was wrong; but, even if there had been a case for treble damages, the province of the jury, under the statute, went no further than to assess the actual damage, and find whether it was willful or

excusable, leaving it to the court to treble the damages in its judgment. See [section] 602. The jury in this case awarded a certain amount "single damages," which, appellee claims, shows appellant not, in any event, to have been injured by the court's charge. But it will not do to presume no injury in a case where the whole charge was so clearly erroneous, based, as it was, on an altogether wrong theory of the case. Jurors, under the charge, might well have agreed to a larger verdict for "single damages," other jurors consenting to waive their view that the damages should be treble, and thus no just verdict would have been found.

The cause must go back for a new trial, wherein the measure of damages will be the value of the trees at the instant when they first became severed from the real estate, without further manipulation.

*McLeod* remains good law. Here, Young's proposed instruction 20 would have instructed the jury that the Ambauens were liable for treble damages. But the *McLeod* court argued that such an instruction is erroneous because it may confuse and mislead the jury. *McLeod*, 2 Wash. at 123. Because Young's proposed instruction was erroneous, the trial court did not err in refusing to give it. *Accord Griffin*, 143 Wn.2d at 90 (trial court has no duty to give an erroneous instruction). Young's claim fails.

## IV. EXCLUSION OF YOUNG'S EXPERT WITNESS

Young did not disclose his intent to call Joe Callaghan, a wetlands biologist, as an expert witness until November 19, 2010, six weeks before the trial's start date of January 3, 2011. On November 29, 2010, Young informed the Ambauens that Callaghan's testimony would "compare and contrast Mr. Rodman's estimate and Mr. Boule's report . . . and to some degree present an objective [third] party review detailing the impacts to and costs of restoration of the damaged area." CP at 507. On December 1, he elaborated that Callaghan "may" testify about:

the level of damage to [Young's] property, [the] current condition of the subject area, the scope of work required for restoration of the damaged wetlands, permitting costs and regulatory authority, cost of excavation of fill, costs and methods of soil and vegetation replacement, soil compaction, [and Callaghan's] opinion on the level of disruption to the pond habitat caused by [the Ambauens'] trespass.

21

CP at 509. Callaghan examined the site and authored a report[12] that the Ambauens did not receive until December 10.

Before trial, the Ambauens moved in limine to exclude Callaghan's testimony because it was cumulative of the testimony of Rodman—Young's previously disclosed expert—and as a sanction for untimely disclosing a witness. Young responded that, because Boule—the Ambauens' expert—was "more qualified in the area of assessing wetlands recovery" than Rodman, Callaghan's testimony was necessary to address Boule's opinion that the filled wetlands would recover on their own. CP at 522; *see also* RP at 15-20. The trial court granted the Ambauens' motion to exclude Callaghan's testimony, stating:

> [B]ased on the argument in the reports attached, this is a new expert opinion. It's a new theory of how to approach restoration . . . [i]t's not a rebuttal expert as it's kind of cast in the response by Mr. Young to the motion, and from everything I have heard here, it's not rebuttal.
> . . . .
> It's prejudicial to [the Ambauens] because this is a whole new theory that's been presented less than four weeks before trial.

RP at 21-22.

Young argues on appeal that the trial court abused its discretion in excluding Callaghan from testifying because it failed to follow proper procedures for imposing discovery violations. The Ambauens respond that the trial court properly excluded Callaghan's testimony as cumulative under ER 403(b). We agree with the Ambauens.

Again, we may affirm on any grounds supported by the record. *LaMon*, 112 Wn.2d at 200-01. "'Decisions involving evidentiary issues lie largely within the sound discretion of the

---

[12] Only the first page of this report, which does not contain the substance of Callaghan's site assessment and opinions, is part of the record on appeal.

trial court and will not be reversed on appeal absent a showing of abuse of discretion.'" *Faust v. Albertson*, 167 Wn.2d 531, 547, 222 P.3d 1208 (2009) (quoting *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1977)).

ER 403 provides that "evidence may be excluded if its probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here, Rodman testified to the damage to Young's property, the scope of required restoration work, and the necessary permits for and cost of such work, and he contested Boule's opinion that simply leaving the property alone was sufficient for restoration. These were the same subject matters to which Young represented that Callaghan would testify. Thus, the trial court could have reasonably concluded that the cumulative nature of Callaghan's testimony substantially outweighed its probative value and the trial court did not abuse its discretion in excluding it. Young's claim fails.

V. LIMITATION ON BOULE'S CROSS-EXAMINATION

At trial, Young attempted to cross-examine Boule about federal jurisdiction over the filled wetlands, apparently intending to ask questions about a "manual" jointly published by the Washington Department of Ecology and United States Army Corps of Engineers. RP at 472-73, 489. The trial court interjected, stating that the "manual" was not relevant and federal jurisdiction was not a question for the jury. RP at 489. Young argued that the information was relevant to whether he needed permits for performing restoration work on the wetlands; the Ambauens responded that Rodman had already testified on this subject. The trial court ruled that it would limit Young's cross-examination of Boule on this subject, stating, "There's been no

wetland delineation done. That's been established by this witness about five times, and he said that's what he would have to do before you go to a permit stage." RP at 491.

Young contends that the trial court abused its discretion in limiting his cross-examination of Boule[13] on federal jurisdiction over wetlands in establishing the necessity of permits for Rodman's recommended restoration project. The Ambauens respond that the trial court properly excluded this evidence as cumulative. We agree with the Ambauens.

"The scope of cross-examination is within the broad discretion of the trial court and will not be overturned on appeal absent an abuse of discretion." *Owens-Corning Fiberglas Corp. v. Dep't of Labor & Indus.*, 25 Wn. App. 658, 659, 612 P.2d 799 (1980). And the trial court may exclude cumulative evidence under ER 403. As discussed above, Rodman testified to the necessity for permits and the types required for his proposed restoration project. On cross-examination, Boule testified that a wetland delineation was necessary before agencies would decide whether permits were required, Young did not necessarily require permits for such a project, and that agencies he had consulted about the project indicated they would not require permits. Thus, the trial court adequately allowed Young to cross-examine Boule on the pertinent question: whether agencies that had jurisdiction over the site would *choose* to exercise that jurisdiction and require permits. Any further questions about federal jurisdiction alone would have been a waste of time and needlessly cumulative under ER 403. Accordingly, the trial court

---

[13] Young also spends a significant portion of his briefing attacking the credibility of Boule's testimony and contending that the trial court should not have allowed him to testify. But this court defers to the trier of fact on witness credibility issues and persuasiveness of the evidence. *Boeing Co. v. Heidy*, 147 Wn.2d 78, 87, 51 P.3d 793 (2002). And Young did not object to Boule's testifying as an expert witness or challenge his qualifications at trial. Thus, we do not consider these issues.

did not abuse its discretion in limiting Young's cross-examination.

## VI. AWARD OF TRIAL ATTORNEY FEES AND COSTS

Young contends that the trial court erred in awarding the Ambauens their trial attorney fees and costs. But Young fails to provide citations to the record supporting his claim. Thus, we do not address it. *Thomas*, 150 Wn.2d at 874.

## VII. ATTORNEY FEES AND COSTS ON APPEAL

Young requests his attorney fees and costs on appeal under RAP 18.1 and RCW 4.24.630(1). The statute provides that

> the person [violating the statute] is liable for reimbursing the injured party for the party's reasonable costs, including but not limited to investigative costs and reasonable attorneys' fees and other litigation-related costs.

RCW 4.24.630(1).

"'Where a statute allows an award of attorney fees to the prevailing party at trial, the appellate court has inherent authority to make such an award on appeal.'" *Colwell v. Etzell,* 119 Wn. App. 432, 442-43, 81 P.3d 895 (2003) (quoting *Standing Rock Homeowners Ass'n v. Misich,* 106 Wn. App. 231, 247, 23 P.3d 520 (2001)). Here, the jury found in the Ambauens' favor. Thus, it did not determine that they had violated RCW 4.24.630(1). Because the statute did not authorize a fee award to Young below, this court may not award his attorney fees and costs on appeal.

Young also devotes one sentence of his brief to requesting attorney fees and costs on appeal under RAP 14.1., .2, and .3. But Young does not prevail in his appeal. Moreover, he provides no argument supporting this request. We do not consider claims unsupported by argument or citation to legal authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809. Likewise, he requests, without citation to the record, attorney fees and costs based on the Ambauens' "bad faith" and "intransigence" at trial. Br. of Appellant at 73-74. We do not consider the request. *Thomas*, 150 Wn.2d at 874.

The Ambauens also request their attorney fees and costs on appeal under RCW 7.06.060, which provides:

> (1) The superior court shall assess costs and reasonable attorneys' fees against a party who appeals the award and fails to improve his or her position on the trial de novo. The court may assess costs and reasonable attorneys' fees against a party who voluntarily withdraws a request for a trial de novo if the withdrawal is not requested in conjunction with the acceptance of an offer of compromise. (2) For the purposes of this section, "costs and reasonable attorneys' fees" means those provided for by statute or court rule, or both, as well as all expenses related to expert witness testimony, that the court finds were reasonably necessary after the request for trial de novo has been filed.

We award the Ambauens their attorney fees and costs as the prevailing party on appeal, as RCW 7.06.060 allowed for such an award at trial. *See Colwell*, 119 Wn. App. at 442-43.

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the

26

No. 41921-1-II

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Bridgewater, J.P.T.

We concur:

Hunt, J.

Johanson, A.C.J.